639 So.2d 47 (1994)
GOLD, VANN & WHITE, P.A., d/b/a Doctors Clinic and G. Robert Klomp, M.D., Appellants,
v.
David Turlington DeBERRY, an incompetent minor child, By and Through his parents, Tom W. DeBERRY and Gwenda T. DeBerry; Tom W. DeBerry and Gwenda T. DeBerry, individually; and D.L. Thornton, M.D., Appellees.
Nos. 91-0392, 91-0924 and 91-2549.
District Court of Appeal of Florida, Fourth District.
April 27, 1994.
*49 Arthur J. England, Jr., of Greenberg, Traurig, Hoffman, Lipoff, Rosen & Quentel, P.A., Miami, and Shelley H. Leinicke of Wicker, Smith, Tutan, O'Hara, McCoy, Graham & Lane, P.A., Fort Lauderdale, for appellants.
G. Gregory Barnhart of Searcy, Denney, Scarola, Barnhart & Shipley, P.A., and Edna L. Caruso of Caruso, Burlington, Bohn & Compiani, P.A., West Palm Beach, for appellees DeBerry.
Kevin S. Doty of Moss, Henderson, Van Gaasbeck, Blanton & Koval, P.A., Vero Beach, for appellee Thornton.

ON MOTIONS FOR REHEARING, REHEARING EN BANC, CLARIFICATION, AND CERTIFICATION
PER CURIAM.
We grant the appellees' motions for rehearing to the extent that we withdraw our September 15, 1993, opinion, and substitute the following:
Appellants bring this appeal from a final judgment in a medical negligence case wherein the jury returned a $12,500,000 verdict in favor of the plaintiff, David Turlington DeBerry, by and through his parents Tom and Gwenda DeBerry. The challenges in this appeal include but are not limited to (1) the admission of inflammatory portions of a Mary Carter Agreement between the DeBerrys and Dr. Thornton, (2) the admission of evidence of insurance coverage limits, (3) jury charges relating to the liability of the parties, and (4) the entry of a directed verdict in favor of Dr. Thornton on Dr. Klomp's contribution claim. We reverse and remand with instructions.

STATEMENT OF FACTS
The plaintiffs/appellees sued Indian River County Hospital District, Dr. Klomp (the obstetrician), Dr. Thornton (the pediatrician), Dr. Wijetilleke, and several others for medical malpractice arising out of the birth of David DeBerry in 1981. Defendant/appellant, Gold, Vann & White, P.A., d/b/a Doctors' Clinic is a professional association that employed several of the doctors involved in this suit, including Dr. Klomp. Plaintiffs/appellees assert that the care and treatment by the obstetrician and pediatrician at the time of delivery and immediately thereafter caused brain damage to their child.
Plaintiff, Gwenda DeBerry, was pregnant with her third child and began her prenatal care with Doctors' Clinic, which had delivered her other two children. Gwenda DeBerry was labelled as a high-risk patient because of her and her family's medical history. A high risk pregnancy meant that there was a likelihood that special medical intervention or assistance would be needed to obtain a healthy baby. As a result of a premature birth, the obstetrician requested that David be brought to the nursery to be kept warm. While at the nursery, one of the nurses on duty noticed that David was grunting, his nostrils were flaring, and that his extremities were turning blue. The obstetrician instructed the nurse to contact the DeBerrys' pediatrician. The pediatrician advised the nurse to warm David in an incubator for 45 minutes and to then call with an *50 update. When she called, she advised the pediatrician that there was no improvement. The pediatrician arrived at the hospital and began administering antibiotic treatment. However, as a result of David's medical state and the treatment that he received, he contracted an infection which caused irreversible brain damage.
A factual dispute exists as to whether the pediatrician knew of David's premature birth and/or of the problems that Gwenda DeBerry incurred prior to delivery. Plaintiffs/appellees argue that their son's condition could have been prevented if the obstetrician and the pediatrician had exercised due care. More specifically, the DeBerrys claim that the obstetrician failed to administer the proper prenatal care and treatment during labor and delivery. Additionally, they assert that the obstetrician failed to advise the pediatrician of the baby's premature birth and failed to arrange the appropriate transition of care to the pediatrician. The DeBerrys contend that the pediatrician failed to personally attend to David when he learned of his birth and failed to immediately order the appropriate treatment and therapy. It is the pediatrician's position that the obstetrician neglected to advise him of crucial facts which would have altered his treatment of David.
In 1985, before the first trial, the DeBerrys settled with the hospital for $1,500,000. As a result of the settlement, the DeBerrys' attorney recovered $600,000 in attorney's fees pursuant to the terms of their contingency fee agreement. In July of 1990, the DeBerrys also settled with Dr. Wijetilleke for $7,500. On February 22, 1990, the obstetrician moved to file a cross-claim for contribution against both the pediatrician and Dr. Wijetilleke. After the obstetrician filed his cross-claim, the pediatrician entered into a conditional settlement agreement with the DeBerrys on March 6, 1990.
The pediatrician's settlement agreement is the focus of several arguments on appeal. Pursuant to the agreement, the pediatrician agreed to pay his policy limits of $500,000 to the DeBerrys in exchange for their promise not to enforce any judgment which might be obtained against him in excess of this amount. The agreement, however, required that the pediatrician remain a defendant in the case and defend his actions in order to prevent the obstetrician from advancing an "empty chair" argument. The settlement contained a provision requiring the DeBerrys to reimburse the pediatrician $450,000 in the event they received a verdict between $3,000,000 and $10,000,000. Further, if the verdict exceeded $10,000,000, the DeBerrys were obligated to refund the sum of $495,000.
The obstetrician alleged in his cross-claim that the pediatrician's negligence proximately caused or contributed to David DeBerry's injuries. In response, the pediatrician filed an affirmative defense to the cross-claim and asserted that he entered into a good faith "conditional settlement agreement" which barred the obstetrician's contribution claim. The obstetrician disagreed and alleged that the settlement was entered into in bad faith and should not serve as a shield to protect the pediatrician from liability. In June 1990, the obstetrician successfully moved to disclose the settlement agreement to the jury and moved unsuccessfully to excise the pediatrician's alleged "self serving" statements contained in the "conditional settlement agreement." The trial court ruled the agreement constituted a "covenant not to sue" rather than a "Mary Carter agreement."
On June 28, 1990, the obstetrician moved unsuccessfully to sever the pediatrician's "good faith settlement" defense to the contribution claim from the upcoming trial. The obstetrician's counsel argued that the issue should be resolved "post-trial" by the court rather than the jury because testimony should be taken from the lawyers who were actually involved in creating the agreement. Plaintiffs' counsel adamantly opposed the motion and argued that severance would deprive both the plaintiffs and the pediatrician of the agreement's purpose and benefit. The trial court ultimately denied the severance motion and permitted the parties to include a discussion regarding the agreement in their opening statements to the jury. At the close of the evidence, the trial court directed a verdict in favor of the pediatrician and against the obstetrician on the latter's cross-claim for contribution, finding that no evidence had been presented that the settlement *51 was not entered into in good faith. The court ruled that the pediatrician and the DeBerrys entered into the settlement agreement in good faith and refused to instruct the jury on any comparative negligence issues or to permit the use of verdict interrogatories which would have established the percentages of negligence on the part of the defendants.
The case went to the jury solely on plaintiffs' negligence claims against the pediatrician, the obstetrician and the Doctors' Clinic. The jury returned a verdict finding all three defendants negligent.

ISSUES
We will address the following issues: whether the trial court erred in directing a verdict for codefendant pediatrician on the contribution issue; whether the trial court erred in admitting the redacted settlement agreement between the DeBerrys and the pediatrician into evidence; and whether the trial court committed reversible error in its discovery and evidentiary rulings.
In related appeals, appellants challenge the trial court's attorney's fees award. We therefore sua sponte consolidate case numbers 91-0392, 91-0924, and 91-2549. This court will also address the questions of whether (1) the trial court properly awarded fees against an insolvent party; and (2) the trial court erred in failing to set off the settlement before calculating the fee that could be taxed.

DISCUSSION AND ANALYSIS

I. DIRECTED VERDICT ON CONTRIBUTION CLAIM

A. INTRODUCTION

We begin our analysis with the contribution claim. The issue as it appeared in the parties' briefs is stated:
IV. WHETHER THE TRIAL COURT COMMITTED REVERSIBLE ERROR SINGLY AND IN COMBINATION IN DISCOVERY AND EVIDENTIARY RULINGS?
A. WHETHER THE TRIAL COURT ERRED IN DIRECTING A VERDICT FOR CODEFENDANT THORNTON ON THE CONTRIBUTION CLAIM BROUGHT BY APPELLANTS AND DENYING DR. KLOMP'S MOTION FOR DIRECTED VERDICT ON THE CONTRIBUTION CLAIM?
During trial, both the pediatrician and the obstetrician moved for a directed verdict on the issues of contribution and good faith. The obstetrician contends that the trial court erred in directing a verdict in favor of the pediatrician and in denying the obstetrician's motion. As stated in Townsend v. Ward, 429 So.2d 404, 407 (Fla. 1st DCA 1983), the standard for directing a verdict is as follows: (1) the court must view the evidence in the light most favorable to the non-moving party, and (2) if there is any evidence to support a possible verdict for the non-moving party, a directed verdict is improper. See also Plotch v. Gregory, 463 So.2d 432 (Fla. 4th DCA 1985). Moreover, in Amoroso v. Samuel Friedland Family Enter., 604 So.2d 827, 831 (Fla. 4th DCA 1992), this court pointed out that "the starting point of any review of a final judgment entered on a directed verdict is the general pronouncements regarding the direction of verdicts." "A trial court may direct a verdict against a plaintiff only if no evidence is introduced on which the jury may lawfully find for the plaintiff." Id.
Section 768.31(5), Florida Statutes (1991), the Uniform Contribution Among Joint Tortfeasors Act, provides:
RELEASE OR COVENANT NOT TO SUE.  When a release or a covenant not to sue or not to enforce judgment is given in good faith to one of two or more persons liable in tort for the same injury or the same wrongful death:
(a) It does not discharge any of the other tortfeasors from liability for the injury or wrongful death unless its terms so provide, but it reduces the claim against the others to the extent of any amount stipulated by the release or the covenant, or in the amount of the consideration paid for it, whichever is the greater; and,

*52 (b) It discharges the tortfeasor to whom it is given from all liability for contribution to any other tortfeasor.
(Emphasis added.) The pediatrician could raise as a defense and a bar to the contribution claim that he entered the agreement in good faith. After the pediatrician made a prima facie showing of good faith, the obstetrician bore the burden of proving that the DeBerrys and Dr. Thornton entered into the agreement in bad faith. See, e.g., Metropolitan Dade v. Simmons, 375 So.2d 858 (Fla. 3d DCA 1979), cert. denied, 386 So.2d 639 (Fla. 1980). The trial court stated when it granted Dr. Thornton's motion for a directed verdict finding that it was "terribly convinced" that no evidence was presented that the "covenant not to sue" was entered into in bad faith.

B. ARGUMENTS AND APPLICABLE CASE LAW

Dr. Klomp argues that he, rather than Dr. Thornton, should have been granted a directed verdict on the good faith issue. However, he does not argue that the "good faith" issue should have gone to the jury.[1] It is the obstetrician's position that good faith was lacking from the subject settlement, thus precluding the subject settlement from releasing the pediatrician from liability on the obstetrician's cross-claim. The record shows that appellants' "collusion" arguments focused on the conduct of the appellees at trial rather than the agreement's negotiations. Moreover, the obstetrician admitted before trial that the settlement agreement was not secret and that there was no collusion leading up to the entry into the agreement.
In support of their case, the DeBerrys and Dr. Thornton cite Weddle v. Voorhis, 586 So.2d 494 (Fla. 1st DCA 1991), where a plaintiff sued Drs. Weddle and Voorhis for malpractice. In Weddle, Dr. Voorhis entered into a settlement agreement wherein the amount of his liability was dependent on the verdict. The jury returned a $395,500 verdict against both doctors. As in the case sub judice, Dr. Weddle not only admitted at trial that the agreement was made in good faith and "open and above board," but he supposedly declined to enter into a comparable settlement agreement. Consequently, the good faith agreement barred Dr. Weddle's contribution claim. We are persuaded that Weddle supports affirmance of the trial court's directed verdict on the contribution claim.
Further, the record before us reflects the following aspects of the pediatrician's involvement in the trial, which lend support to the directed verdict on the good faith issue; Dr. Thornton: (1) vigorously cross-examined the DeBerrys' and the obstetrician's liability witnesses; (2) presented expert testimony on his behalf; and (3) presented trial testimony that was consistent with his deposition testimony provided years before the settlement agreement was entered.

C. CONCLUSION

The bottom line is that we disagree with the appellants' contention that there were factual issues on the contribution claim to go to the jury, which precluded a directed verdict. We base this determination primarily on the obstetrician's concession of no preagreement collusion, Weddle, 586 So.2d at 494, and the trial factors set forth above. Considering all of these factors, we hold that appellants have failed to meet their burden to demonstrate the trial court reversibly erred in granting a directed verdict in favor of Dr. Thornton on the contribution claim. Accordingly, we affirm as to this issue.

II. THE SETTLEMENT AGREEMENT

A. INTRODUCTION

Before trial, the lower court ruled that the subject settlement was a "covenant not to sue" rather than a "Mary Carter" agreement[2] because there was no inherent secrecy *53 to the document. However, in order to determine whether the agreement was entered into in good faith, disclosure is necessary. Irrespective of how we label the document, it should be noted that the distinction between a "Mary Carter" agreement and other types of settlements is crucial, for example, when the issue is whether the jury should be informed of the agreement. However, in the instant case none of the parties argued that the agreement's existence should be withheld from the jury or even that agreement was totally inadmissible. Rather, the dispositive question is whether some portions of the agreement as presented to the jury resulted in reversible error.
The Florida Supreme Court in Maule Industries, Inc. v. Rountree, 284 So.2d 389 (Fla. 1973), held that "Mary Carter" agreements are not only discoverable, but are admissible into evidence at trial. Such agreements are admissible to enable the jury to assess the agreeing defendant's credibility and good faith.
This court recognized in the case of Insurance Co. of North America v. Sloan, 432 So.2d 132 (Fla. 4th DCA 1983), that parties often include gratuitous and self serving language in Mary Carter agreements which extol the virtues and righteousness of the participating parties while castigating the actions and positions of the defendants who choose not to participate. In Sloan we held that Mary Carter agreements should not contain self serving statements or boldly distorted questions of fact that may usurp the jury's presence or result in their inability to understand or evaluate the actions and motives of the signatory parties. The Florida Supreme Court approved the Sloan holding in Bechtel Jewelers v. Insurance Co. of North America, 455 So.2d 383, 384 (Fla. 1984), wherein they held that to admit the entire agreement in all cases would encourage "creative drafting that would prejudice nonagreeing defendants, who would then be faced with a Hobson's choice regarding the introduction of such agreement."[3]

B. EXCISED PORTIONS

Procedurally, the trial court denied Dr. Klomp's pretrial motion to exclude portions of the agreement and stated that the "covenant not to sue" was to be "communicated to the jury in toto." Nevertheless, several days after the trial began and after opening statements addressed the entire agreement, the DeBerrys moved successfully to excise the provision of the agreement that mentioned Dr. Klomp's policy limits. When Dr. Thornton was called to testify, counsel for Dr. Klomp questioned him about the agreement. On cross-examination, when counsel for the DeBerrys asked Dr. Thornton to read plaintiffs' excised version of the agreement into evidence, counsel for Dr. Klomp objected because he wanted his excised version read instead. Dr. Klomp objected to plaintiffs' version because "it interjects insurance limits into the case and contains various self serving statements favorable to the Plaintiffs." Ultimately, the trial court admitted plaintiffs' excised version, ruling that it could be read to the jury because "the door has already been opened concerning the document."
Upon reviewing the agreement, those portions excised and those not, we find that the trial court committed reversible error in permitting certain portions of the agreement to be read to the jury. In fact, we concur with Dr. Klomp's assertion that even in its "cleaned up" form the agreement is replete with Dr. Thornton's self-serving, back-patting statements which invaded the jury's province regarding liability. See Sloan, 432 So.2d at 134 (the jury may not receive offerings which baldly distort, denigrate or conclude questions of fact that usurp *54 the very reason for the jury's presence in the first place). Moreover, it is apparent that much of the language read to the jury made improper reference to Dr. Thornton's insurance coverage. It is hornbook law that a jury should not learn of the existence of insurance coverage or insurance limits. Melrose Nursery, Inc. v. Hunt, 443 So.2d 441 (Fla. 3d DCA 1984). See, e.g., Beta Eta House Corp. v. Gregory, 237 So.2d 163, 165 (Fla. 1970) (existence or amount of insurance has no bearing on the issue of liability and damages and such reference was reversible error); Craft v. Kramer, 571 So.2d 1337 (Fla. 4th DCA 1990), rev. denied, 584 So.2d 998 (Fla. 1991).
The following is the complete text of the agreement. Although modified to exclude the bold portions prior to its presentation to the jury, we hold that further modifications should have been made. In this regard, we have underlined the sections that were properly submitted; the remaining provisions being those that should have also been excised.
Tom and Gwenda DeBerry, as Guardians of their minor incompetent child, David Turlington DeBerry, and Tom and Gwenda DeBerry, individually, hereinafter referred to as "Plaintiff" and Daniel L. Thornton, M.D., and Daniel L. Thornton, M.D.P.A., hereby enter into the following Conditional Settlement Agreement:
In consideration of the fact that had the Defendant Thornton known that Mrs. DeBerry had premature rupture of the membranes for more than 24 hours, and had Dr. Thornton been aware that there was a question of David DeBerry being 32 1/2 weeks gestation by dates and 34 1/2 weeks by ultrasound, Dr. Thornton would have acted differently; and
In consideration of the fact that Defendant Thornton has only $500,000 in liability insurance limits; and
In consideration of Defendant Thornton's good faith offer of his policy limits of $500,000, despite it being inadequate to insure care for the Plaintiffs; and despite his belief that the ultimate responsibility, if any, belongs on Defendants, Klomp and Doctors' Clinic; and
In consideration of the Defendant Klomp and Doctors' Clinic failure to make a good faith offer to settle despite much larger policy limits of insurance; and
In consideration of the Plaintiffs' financial strain in attempting to care for the extraordinary needs of David DeBerry, which have resulted in the severe need to recover some monies immediately to stave off having to give up a wheel chair livable home constructed especially for David DeBerry;

IT IS HEREBY AGREED between Plaintiffs and Defendant Thornton, that Defendant Thornton will immediately pay his policy limits of $500,000 to Tom and Gwenda DeBerry as guardians of David DeBerry and to their attorneys, SEARCY, DENNY, SCAROLA, BARNHART & SHIPLEY, P.A.; that Plaintiffs will covenant not to enforce any judgment which might be obtained against the Defendant Thornton for any amount above the $500,000 which he has been paid; that Defendant Thornton will remain a Defendant in the case and will defend his actions and, if Plaintiff recovers a Judgment against Dr. Klomp and/or Doctors' Clinic for an amount between $3,000,000.00 and $10,000,000.00 upon recover of that Judgment, Plaintiff will reimburse Dr. Thornton $450,000 out of the $500,000 paid; and will collect that amount from Defendants Klomp and Doctors' Clinic instead of receiving it from Defendant Thornton and, if Plaintiffs should recover a Judgment against the Defendants Klomp and/or Doctors Clinic in excess of $10,000,000.00 Plaintiffs will reimburse Defendant Thornton $495,000 of the $500,000 paid in recognition of the fact that Plaintiffs will have made a [full] recovery from the Defendants Klomp and/or Doctors' Clinic due to the confusion caused by the failure to communicate accurate information and Plaintiffs will collect that portion of the Judgment from Defendants Klomp and Doctors' Clinic instead of receiving it from Defendant Thornton.

C. CONCLUSION

The only evidence the jury should have received was a simple statement of the central *55 terms of the agreement. Anything more was self serving, unnecessary and prejudicial. The statements concerning insurance coverage should have been excluded as well as the argumentative assertions concerning relative fault. Parts of the agreement should have been excised and presented to the jury in the redacted form shown above. The agreement as presented subjected the nonparticipating parties to extreme prejudice which mandates reversal of the jury's verdict and a new trial.

III. ADDITIONAL DISCOVERY AND EVIDENTIARY ISSUES

For the benefit of the trial court on retrial we will briefly discuss the following issues.
A. Appellants contend the trial court erred in excluding their expert annuitist after it had permitted an economist to testify for the plaintiffs. The abuse of discretion standard applies to trial court decisions involving expert qualifications and the scope of subjects about which an expert can testify. See Town of Palm Beach v. Palm Beach County, 460 So.2d 879 (Fla. 1984). In the instant case, the jury was asked to reduce the future medical expense award to present value. Plaintiffs' expert economist testified that based on the life care plan designed by plaintiffs' rehabilitation expert and David DeBerry's 63-year life expectancy, future economic damages totalled $173,925,775, with a present value of $7,835,495.
After plaintiffs' economist and rehabilitation experts testified, plaintiffs moved to strike the defendants' expert annuitist, Mr. Wagner.[4] The trial court granted the plaintiffs' request to strike the annuitist's testimony but permitted Dr. Klomp to proffer testimony. As a result, Dr. Klomp argues that he was deprived of presenting relevant evidence to the jury concerning "present money value." Mr. Wagner proffered that a $731,385.01 annuity would be needed to generate $48,270 annually to pay the anticipated medical expenses for the duration of David's life. Plaintiffs argued that the annuitist's testimony established the future value of a present sum rather than the requisite present value of a future sum. The trial court apparently agreed with the plaintiffs' additional argument that the annuitist's testimony was speculative, was based on hearsay from the underwriters, and would mislead the jury because it was based on an illusory contract or promise. Dr. Klomp's counsel argued that the annuitist's testimony was no more speculative than the economist's testimony which was already permitted by the trial court. More specifically, Dr. Klomp argued that the plaintiffs' objections concerned the weight of the evidence rather than its admissibility.
In light of our decision in North Broward Hospital District v. Bates, 595 So.2d 578 (Fla. 4th DCA), rev. denied, 605 So.2d 1265 (Fla. 1992), we affirm the trial court's ruling regarding this issue. In North Broward, this court held that a trial court did not abuse its discretion by failing to permit a defendant to introduce evidence on the cost of an annuity to fund future medical expenses. We reasoned that although evidence of the cost of an annuity to compute present value had been admitted in Florida cases involving loss of future earning capacity and loss of support in wrongful death actions, there was no Florida case law which authorized the jury to utilize an annuity approach in determining future medical damages. See also Loftin v. Wilson, 67 So.2d 185 (Fla. 1953); Renuart Lumber Yards v. Levine, 49 So.2d 97 (Fla. 1950).
B. Appellants also contend the trial court erred by improperly limiting the scope of cross-examination of plaintiffs' experts regarding income received from other work for plaintiffs' counsel and in precluding discovery from these experts as to work performed for plaintiffs' counsel during the years 1987 through 1989. As noted this case has been mistried twice and on the third trial, plaintiffs obtained the judgments now on appeal. Before the first trial in 1985, the judge ordered the plaintiffs to answer interrogatories and reveal the monies the plaintiffs' law firm paid to various expert witnesses *56 in all cases from 1981-1984, not just the instant case. Plaintiffs unsuccessfully argued that preparing the answers would be unduly burdensome and that they called for disclosure of confidential information. This court denied the plaintiffs' petition for certiorari which required them to update their answers upon request prior to the 1987 trial.
In 1990, Dr. Klomp's counsel requested that the July 1987 answers be updated. The only information provided by plaintiffs' response was the amount that the experts had been paid in the instant case since 1987. At a March 7, 1990, hearing, plaintiffs' counsel explained that their update was sufficient and that to produce any additional material would be unduly burdensome since records were not made or kept. The trial court denied Dr. Klomp's motion finding that the information sought was collateral, and that when weighed against the difficulties and costs attendant to such production it was in fact "onerous and burdensome." We disagree.
The standard of review for discovery orders is abuse of discretion. Weck v. Weck, 464 So.2d 619 (Fla. 4th DCA), rev. denied, 471 So.2d 44 (Fla. 1985). We recognize the trial court did not have the benefit of our holding in the case of McAdoo v. Ogden, 573 So.2d 1084 (Fla. 4th DCA 1991). This decision mandates a finding that the trial court abused its discretion. In McAdoo, wherein the plaintiff sought a defense expert doctor's records, this court held that the doctor's only burden was to produce an estimate as to the approximate cost of compiling the information and subsequently supervising that production. This court noted that the information was relevant to demonstrate the witness's potential bias, if a significant part of the doctor's income was derived from the defenses business. Here, the updated answers are relevant for the same or similar reasons. Accordingly, we hold the trial court erred when it limited Dr. Klomp's request for discovery and cross examination related to the witness's income derived from rendering expert witness services on behalf of clients represented by appellee's counsel.
C. Finally appellants contend the trial court erred in excluding defense experts, Dr. Chalub, Sharon Griffin, Dr. Susan Farrell, Dr. Eyman and Dr. Hollingsworth. In February and March of 1990, Dr. Klomp amended his witness list to include additional and substitute witnesses. On March 21, 1990, plaintiffs moved to strike these additions as no new medical or economic issues arose in the case to warrant same. Moreover, plaintiffs' counsel contended that Dr. Klomp's additional experts would present new issues on liability, causation and damages, and therefore, the plaintiffs would be prejudiced by having to obtain witnesses to counter these new theories. Ultimately, the trial court granted the plaintiffs' motion to strike the expert witnesses' testimony. We affirm this ruling in accordance with our sister court's ruling in Carpenter v. Alonso, 587 So.2d 572 (Fla. 3d DCA 1991). In Carpenter, the third district held that a trial court could properly limit expert witnesses in medical malpractice cases to one expert per side. See also Maler v. Geraldi, 502 So.2d 973 (Fla. 3d DCA 1987). As postulated in Stager v. Florida East Coast Railway Company, 163 So.2d 15, 17 (Fla. 3d DCA 1964), "a trial judge is charged with the conduct of a trial and only such conduct on the part of the trial judge as would result in an abuse of discretion, depriving a party of due process of law, would warrant an appellate court directing a trial judge as to the manner of conducting his courtroom." In this regard, the limiting of the number of witnesses for a given side has long been recognized as appropriate. Since Dr. Klomp's counsel failed to proffer what evidence he would have sought to elicit from the witnesses he was prevented from calling, appellant has failed to meet his burden to establish that error occurred.

IV. ALLOWING DR. GOFFMAN'S WRITINGS TO GO TO JURY

Dr. Klomp has raised the issue of whether it was error for the trial court to allow certain summaries and charts, filled in by expert witnesses during the course of their testimony, to go to the jury room during deliberations. Particular reference is made to items 1, 4, 5 and 13 of the appendix to Dr. Klomp's brief. These were apparently *57 done by Dr. Goffman during his direct testimony, and became the basis of the exact amounts awarded by the jury. We hold that it was error to admit these charts and figures into evidence, and to allow them into the jury room.
While there is certainly no problem in such an expert witness writing down their figures as he or she testified  even as to ultimate amounts for damages  we believe the better practice is to mark such exhibits as "Court Exhibit ____, Not in Evidence." They can then be made part of the record, for appellate review, but should not be in evidence, nor given to the jury for their deliberations. We therefore reverse as to this issue as well.

V. ATTORNEY FEES

A. INTRODUCTION

Our rulings set forth above mandate automatic reversal on the issue of attorney's fees and costs. However, since we have instructed the lower court to conduct a new trial, these issues may arise again.
The jury in the underlying case returned a verdict of $12,500,000 in favor of the DeBerrys finding medical negligence on the part of Dr. Thornton, Dr. Klomp, and Gold, Vann & White, P.A., d/b/a Doctors Clinic. In an effort to modify the jury verdict, Dr. Klomp and Doctors Clinic moved the trial court to set off the various settlements that were entered into at the time the suit was initiated. The trial court granted the defendants' request setting off $1,500,000 for the settlement with the Indian River Memorial Hospital, $7,500 for the settlement with Dr. Wijetilleke, and $5,000 representing the amount the court found the plaintiffs could recover from Dr. Thornton pursuant to their conditional settlement agreement. Consequently, the trial court amended the final judgment to reflect the setoffs. The amended final judgment, dated January 16, 1991, found for the plaintiffs in the amount of $10,987,500 and against the defendants, Dr. Klomp and Doctors Clinic.
Following the entry of the amended final judgment, the plaintiffs, as the prevailing parties in a medical malpractice action, moved to tax attorney's fees and costs as permitted by section 768.56, Florida Statutes (1983), and pursuant to their contingent fee contract with their attorney. Upon the entry of the amended final judgment, the defendants' attorneys stated that said judgment rendered their clients insolvent and thus they were protected by section 768.56's language that "attorney's fees shall not be awarded against a party who is insolvent or poverty stricken." More specifically, they claimed that neither Dr. Klomp nor the clinic possessed the personal assets or the insurance coverage to adequately satisfy the amended judgment. Subsequently, the trial court entered an order on plaintiffs' motion for attorney's fees which made specific findings regarding the reasonable hours expended by each of plaintiff's attorneys and paralegals, and the reasonable hourly rates for those services. The order also indicated that the trial court determined that based on all the evidence presented the appropriate multiplier for the lodestar applied was 2.5.
The trial court found that the defendants, Dr. Klomp and Doctors Clinic, were solvent and consequently entered a $5,550,000 attorney's fee judgment and a $114,761.93 cost judgment. The defendants/appellants then pursued this appeal.

B. DISCUSSION AND ANALYSIS

Section 768.56, Florida Statutes (1983), does not define "insolvent" nor does it state who bears the burden of proof of solvency or insolvency. It appears that the legislative intent behind said statute is to discourage non-meritorious medical malpractice claims. See Florida Patient's Compensation Fund v. Rowe, 472 So.2d 1145 (Fla. 1985), modified on other grounds by Standard Guar. Ins. Co. v. Quanstrom, 555 So.2d 828 (Fla. 1990). Additionally, the statute protects indigent individuals by insuring their access to the courts by exempting them from attorney's fee judgments. See, e.g., Bayfront Medical Ctr., Inc. v. Kim Oang Thi Ly, 465 So.2d 1383 (Fla. 2d DCA 1985). Accordingly, we affirm the trial court's ruling that Dr. Klomp and the clinic were not "insolvent" for purposes of section 768.56. Ames v. Lindsey, 551 So.2d 564 (Fla. 4th DCA 1989).
*58 The last issue that need be addressed is whether the trial court erred in failing to set off all funds received in settlement before calculating the maximum attorney's fee that could be taxed against Dr. Klomp and Doctors Clinic.
Appellants argue that with proper setoffs, the maximum attorney's fee should have been calculated by reducing the amount of the verdict by $2,007,500 ($1.5 million from Indian River, $500,000 from Dr. Thornton, and $7,500 from Dr. Wijetilleke), in determining the proper fee. Appellants are mostly correct in this assertion. Based on the jury's verdict, the offset attributable to the recovery from Dr. Thornton should have been $5,000  not $500,000. Appellants also contend that a windfall exists in the instant case because it is undisputed that plaintiffs' counsel received $600,000 in fees when settling with the hospital. We agree. See National Found. Life Ins. Co. v. Ward, 524 So.2d 689 (Fla. 4th DCA 1988). Following the logic of Ward, appellees' attorney received a double recovery with respect to the $600,000 in fees already paid. Therefore, this amount should have been set off. Of course, our reversal on this issue is without prejudice for the DeBerrys' attorneys to again apply for attorneys fees, consistent with this opinion, if they prevail on retrial. Chabad House-Lubavitch v. Banks, 609 So.2d 780 (Fla. 4th DCA 1992).
The remaining points raised on appeal have been considered and found to be without merit. Accordingly, this cause is reversed and remanded to the trial court with instructions to conduct a new trial, consistent with this opinion.
DELL, C.J., POLEN, J., and SEIDLIN, LARRY, Associate Judge, concur.
NOTES
[1] We expressly recede from the dicta contained in our September 15, 1993, opinion, suggesting that the good faith/bad faith issue should be tried by the court without a jury, and before the main action.
[2] As we explain, the question of whether the agreement is a "Mary Carter," a "covenant not to sue," or something else, has no bearing on our determination to reverse. To be sure, the agreement discussed may be a hybrid of different forms. We refer to it as a "Mary Carter" because we think it most closely resembles such an agreement, and to facilitate our discussion.
[3] We note that the Florida Supreme Court has held that Mary Carter agreements are void as against public policy. Dosdourian v. Carsten, 624 So.2d 241, 247-48 (Fla. 1993). However, Dosdourian does not change our decision on this issue because the supreme court stated that its opinion is prospective and would not affect the legality of any agreements entered into prior to the opinion's date. Id. at 247-48. Additionally, the supreme court expressly stated that upon remand the subject agreement shall be admitted into evidence upon Dosdourian's request, thereby indicating that its holding should not affect the future admissibility of existing agreements. Id.
[4] The issue of Wagner's testimony was not raised before trial because both sides agreed to let the other know whom they would call from their respective list of 100 witnesses on the night before the witness was to testify. As agreed, it was only then that the plaintiffs learned that Wagner would be called.