742 So.2d 391 (1999)
M.J. STAVOLA FARMS, INC., et al., Appellants,
v.
DEPARTMENT OF TRANSPORTATION, STATE OF FLORIDA, Appellee.
No. 98-3477.
District Court of Appeal of Florida, Fifth District.
August 27, 1999.
Rehearing Denied October 1, 1999.
*392 James M. Spoonhour and John T. Wettach, Jr., of Lowndes, Drosdick, Doster, Kantor & Reed, P.A., Orlando, and David W. Foerster of Foerster, Isaac & Yerkes, P.A., Jacksonville, for Appellants.
Pamela S. Leslie General Counsel and Vance W. Kidder, Assistant General Counsel, Department of Transportation, Tallahassee, for Appellee.
W. SHARP, J.
Appellants[1] appeal three orders[2] entered after a jury verdict in an eminent domain proceeding, which resulted in a partial taking. This is a lengthy and complex case involving the valuation of mineral rights to the lessee and the valuation of land to the fee holder. Appellants argue, inter alia, that the trial court erred in striking the *393 testimony of its business valuation expert, and in granting a new trial on both business and land damages. We affirm in part and reverse in part.
The Florida Department of Transportation (the Department) condemned 40.8 acres of an 815 acre parcel of land in Marion County in connection with the construction of a new portion of S.R. 326. The 40.8 acres involved the Zuber Mine and was part of land owned by the Cummer Land Trust ("Cummer"), and leased to Dixie Lime & Stone Co. and M.J. Stavola Farms, Inc. (collectively referred to as "Dixie Lime"). The condemned property had been leased for the purpose of mining limerock. The lease term was for 50 years, from December 1965 to 2015, and there was an option for another 25 years. At the time of the taking in August 1995, there remained 20 years on the original lease and 25 years on the option.
The only issues in this trial were valuation of Cummer's land interest, and valuation of Dixie Lime's business damages. Steve Matonis testified to land damages to the owner and relied on figures supplied by appellants' geologist, Fountain. In calculating damages, Matonis referred to Cummer's "severance damages," which included reduction in value to the remaining property. City of Tallahassee v. Boyd, 616 So.2d 1000 (Fla. 1 st DCA 1993), approved, 647 So.2d 819 (Fla.1994). Matonis estimated that Cummer would suffer lost income of $1,017,500 on the taken limerock. He based his valuation on "mineable property," because by the time the lease had expired, all of the remaining limerock would have been mined. The jury returned a verdict which totaled $1,357,500 ($340,000 value of land taken plus $1,017,500 severance damages.) The jury's verdict is supported by competent evidence in the record.
Dixie Lime is entitled to business damages for the partial taking under section 73.071(3). Business damages are not granted as a matter of right; they are a matter of legislative grace. Texaco, Inc. v. Dept. of Transportation, 537 So.2d 92, 94 (Fla.1989).[3] Business damages are generally in the nature of lost profits, which is the reduced profit-making capacity of the business caused by taking a portion of the property. Murray v. Dept. of Transportation, 687 So.2d 825 (Fla.1997); City of Tallahassee v. Boyd, 616 So.2d 1000 (Fla. 1st DCA 1993), approved, 647 So.2d 819 (Fla.1994). When a lessee claims business damages, the damages are limited by the duration of the leasehold. Seminole County v. Sanford Court Investors, Ltd., 743 So.2d 1165 (Fla. 5th DCA 1999).
To establish the value of Dixie Lime's damages, the Department called Bruce La-Frenz, a geologist. LaFrenz estimated that the total amount of limerock lost for mining purposes was 16 million tons, and that the limerock remaining on the land after the taking was 32 million tons. The Department's business valuation expert, Davis, a CPA, concluded that the average production from this mine was 625,197 tons annually, for the years 1994 through 1996. Based on LaFrenz's estimate of remaining limerock, Dixie Lime could continue to mine limerock at its current rate for 52.6 years. Davis therefore concluded that Dixie Lime would suffer no business-damage loss, because the property remaining after the taking contained more limerock than Dixie Lime could mine during the balance of the 45 years of the lease.[4]
*394 To establish its case, Dixie Lime's geologist, Richard Fountain, testified that the amount of limerock lost by the taking, and the limerock remaining for mining purposes after the taking, was proportionally the reverse to that of LaFrenz. Fountain testified that the total amount of lost limerock was 30 million tons, and that there were only 16 million tons of limerock remaining. Tindall, a CPA who had taken courses in business valuation, was Dixie Lime's business valuation expert. Relying on Fountain's figures, she concluded that business losses to Dixie Lime would be $3,364,000. The jury returned a verdict for Dixie Lime in that amount.
At the trial and as a part of its motion for new trial, the Department sought to strike Tindall's testimony because she failed to consider the actual activities of Dixie Lime's business operation, i.e., Dixie Lime had continued to mine at the same rate after the taking as it had done before. Tindall testified that the $3,364,000 loss was based on the profits Dixie Lime would have made on the 30 million tons taken, over the 45 years remaining on the lease. The loss of profit on the 30 million tons was calculated at $438,607 per year, based on Dixie Lime's continuing to mine 626,582 tons of limerock per year. She then took the annual loss figure and discounted it explaining that, a dollar today is worth more than a dollar tomorrow, and when measuring damages beyond one year, the time value must considered. But Tindall failed to consider the actual production of limerock by Dixie Lime, which had continued at its pre-taking rate.
At one point, Tindall conceded that Dixie Lime was not losing $438,607 per year based on production of 626,000 tons and that Dixie Lime continued mining the limerock, explaining:
[W]e're not saying the business [is] lost. We're saying what is the value of the limerock that's lost. They continued mining limerock; we can see that in the financial data. But what they can't do is mine that 30 million tons. (Emphasis supplied)
Tindall further agreed with the Departments's lawyer, Gendzier, who, referencing her exhibit, asked her if future damages were calculated from year 26 of Dixie Lime's lease (at which time, pursuant to Dixie Lime's figures, there would be no further limerock to mine), the damages would be $111,960. She responded in the affirmative, because that was the figure she had assigned to the loss on her exhibit from that date to the end of the lease.
Tindall failed to conceptualize one crucial fact, which tainted her testimony and confused and misled the jury: limerock is fungible[5] and although the specific 30 million tons of limerock on the property subject to the taking were no longer available for mining purposes, that did not mean that Dixie Lime would lose profit on those 30 million tons over the remaining 45 years of the lease. What is relevant are Dixie Lime's business damages, not the property taken. The lost limerock is relevant only as it may actually affect business damages suffered by Dixie Lime. The issue pertinent to business damages is whether Dixie Lime could continue to mine the same tonnage for the 45 years remaining on the lease, not whether it could mine the specific 30 million tons lost in the taking.[6]
*395 Tindall also testified that Dixie Lime might mine the 30 million tons 45 years in the future, or that it could allow someone else to operate the business, which would result in profit to Dixie Lime. However, Dixie Lime presented no evidence that it had planned, at the time of the taking, to increase production over the next 45 years, or that demand or price would increase. Future speculative damages such as these are not properly considered for valuation purposes. Webb Automotive Distributors, Inc. v. Baxter, 574 So.2d 1139, 1140 (Fla. 4th DCA 1991). See also U.S. v. 22.80 Acres of Land, 839 F.2d 1362, 1365 (9th Cir.1988); Foster v. U.S., 2 Cl.Ct. 426 (Cl.Ct.1983).
In this case, Dixie Lime's evidence (the most favorable to Dixie Lime) established that there were sufficient limerock reserves for it to produce limerock at its current level for 25 years. Thus, for the next 25 years it will suffer no lost profits. After that time, in year 26, Dixie Lime will suffer lost profits for the remaining period of its lease, through year 45. Based on this record, we conclude that the trial court did not err in striking Tindall's testimony. In this case, the expert's opinion is unsupported by the evidence or law, is misleading because it employs an erroneous methodology, and is properly excluded. See Webb Automotive. A trial court's order striking a witness' testimony and granting a new trial is reviewed on an abuse of discretion standard. Gold, Vann & White, P.A. v. DeBerry By and Through DeBerry, 639 So.2d 47, 56 (Fla. 4th DCA 1994).
However, we find no error in the jury verdict regarding the owner's land damages and reverse the order for a new trial to that extent. Where one side of conflicting evidence supports the jury's verdict, it is error to grant a new trial. Geffrey v. Langston Construction Co., 58 So.2d 698 (Fla.1952); Martin v. Stone, 51 So.2d 33 (Fla.1951); Edwards v. Miami Shores Village, 40 So.2d 360 (Fla.1949).
This opinion and the rotation of the trial judge renders the remaining issues moot. Lamb v. Leiter, 603 So.2d 632, 635 n. 4 (Fla. 4th DCA 1992); Adkins v. Winkler, 592 So.2d 357 (Fla. 1st DCA 1992). We therefore remand to the trial court for a new trial on the issue of Dixie Lime' business damages, consistent with this opinion.
AFFIRMED IN PART; REVERSED IN PART; AND REMANDED.
DAUKSCH and THOMPSON, JJ., concur.
NOTES
[1] The appellants include: Cheryl Cummer, Robert Paul, III and Howard Harrison, Jr. as trustees of the Cummer Land Trust and as owners of the subject property; and M.J. Stavola Farms, Inc. and Dixie Lime & Stone Co., as lessees/business owner-operators of the subject property.
[2] These orders include: (1) Order on Motion to Disqualify the Judge dated November 20, 1998; (2) Order Striking Portions of Respondents' verified Motions to Disqualify the Judge, dated November 24, 1998; and (3) combined Order on Motion to Strike Testimony of two expert witnesses; Motion for JNOV; Motion for a New Trial; and Motion for Entry of Final Judgment, dated November 24, 1998. The motion to disqualify the judge was denied. The third order granted the motion striking the testimony of Tindall (an expert witness) and granted the motion for a new trial; the remainder of the motions considered in this order were denied. No final judgment was entered in this case.
[3] They are not part of the constitutionally protected "just" or "full" compensation; they are intangibles which are not property in the constitutional sense. Behm v. Division of Admin., 383 So.2d 216 (Fla.1980); Broward County v. Carney, 586 So.2d 425 (Fla. 4th DCA 1991).
[4] By way of explaining the expert's conclusion that Dixie Lime will experience no business damages, this is analogous to valuing the extent to which a person entitled to pump gas from a fuel tank for 30 minutes has been damaged by the withdrawal of a portion of the gasoline from the pump. If the pump capacity and supply of fuel are sufficiently large, the person entitled to pump gas for 30 minutes will not be damaged by the withdrawal because the supply will not be exhausted in 30 minutes.
[5] We note, however, that upon retrial if appellants can show that the quality of the remaining limerock is inferior, or that costs to mine the remaining limerock are greater than those of the limerock taken, this would properly be considered as an element of business damages because either would affect profits.
[6] To re-employ the gasoline pump analogy, if the pump capacity and supply are not sufficiently large so that a person who has the right to pump fuel for 30 minutes will exhaust the fuel in the pump before the 30 minutes of pumping has passed, then the withdrawn fuel has resulted in damages to the pumper. The measure of the damage is not, however, the value of the gasoline withdrawn from the pump, but the amount by which the pumper's share has been cut short. That turns on valuing the amount of gasoline the pumper could have pumped, after the supply was exhausted, in the balance of the 30 minutes originally allotted to the pumper.