624 So.2d 241 (1993)
Patricia DOSDOURIAN, Petitioner,
v.
Richard Paul CARSTEN, et al., Respondents.
No. 78370.
Supreme Court of Florida.
August 26, 1993.
*242 John P. Joy of Walton, Lantaff, Schroeder & Carson, Miami, for petitioner.
Louis M. Silber of Pariente & Silber, P.A., West Palm Beach, and Larry Klein of Jane Kreusler-Walsh, West Palm Beach, for respondents.
Marguerite H. Davis of Katz, Kutter, Haigler, Alderman, Davis & Marks, P.A., Tallahassee, amicus curiae for American Ins. Ass'n.
Clifford M. Miller of Clifford M. Miller, Chartered, Vero Beach, amicus curiae for the Academy of Florida Trial Lawyers.
GRIMES, Judge.
We review Dosdourian v. Carsten, 580 So.2d 869 (Fla. 4th DCA 1991), in which the court certified the following question as being of great public importance:
IS A NON-SETTLING DEFENDANT ENTITLED TO HAVE THE JURY INFORMED OF A SETTLEMENT AGREEMENT BETWEEN THE PLAINTIFF AND ANOTHER DEFENDANT WHEREBY THE SETTLING DEFENDANT'S OBLIGATION IS FIXED BUT THE SETTLING DEFENDANT IS REQUIRED TO CONTINUE IN THE LAW SUIT?
Id. at 872. We have jurisdiction under article V, section 3(b)(4) of the Florida Constitution.
Richard Paul Carsten brought suit against Patricia Dosdourian and Christine DeMario alleging that each of them had negligently operated their automobiles in such a manner as to cause him serious personal injuries. Shortly before trial, Carsten filed a motion in limine seeking to prevent disclosure to the jury that he had entered into an agreement under which he settled all claims against DeMario in return for payment of her insurance policy limits of $100,000 and her continued participation in the litigation through trial and judgment. The trial judge granted Carsten's motion by ruling that the agreement would not be disclosed to the jury unless the live testimony of DeMario was presented at trial. In that event, the matter could be addressed on cross-examination. Further, the judge ruled that Dosdourian could not raise matters pertaining to the agreement if it was Dosdourian who called DeMario as a witness during trial. In the face of this ruling, Dosdourian moved that DeMario be dismissed from the litigation. This motion was denied.
At the trial, Carsten introduced DeMario's deposition, which had been taken before the settlement was reached. Because DeMario did not personally testify at the trial, the jury was not made aware of the settlement agreement between Carsten and DeMario. At the conclusion of the trial, the jury allocated negligence as follows: Dosdourian 35%, DeMario 55%, and Carsten 10%. The jury awarded over $2 million in damages for medical costs, lost earnings, and pain and suffering.
Dosdourian argued on appeal that the trial judge should have permitted the jury to be apprised of the settlement agreement under the rationale of Ward v. Ochoa, 284 So.2d 385 (Fla. 1973). In Ward, this Court addressed the issue of whether "Mary Carter agreements"[1] *243 should be disclosed to the jury. We described the typical Mary Carter agreement as follows:
A "Mary Carter Agreement," however, is basically a contract by which one codefendant secretly agrees with the plaintiff that, if such defendant will proceed to defend himself in court, his own maximum liability will be diminished proportionately by increasing the liability of the other codefendants. Secrecy is the essence of such an arrangement, because the court or jury as trier of the facts, if apprised of this, would likely weigh differently the testimony and conduct of the signing defendant as related to the non-signing defendants. By painting a gruesome testimonial picture of the other defendant's misconduct or, in some cases, by admissions against himself and the other defendants, he could diminish or eliminate his own liability by use of the secret "Mary Carter Agreement."
Id. at 387. Concluding that such agreements tend to mislead judges and juries and border on collusion, we held that they must be produced for examination before trial if sought to be discovered under appropriate rules of procedure and should be admitted into evidence at trial upon the request of any other defendant who may stand to lose as a result of the agreement. Id.
In the instant case, the agreement did not provide that DeMario had the opportunity to diminish her own liability by staying in the litigation and the district court of appeal found it difficult to identify actual prejudice resulting from the nondisclosure of the agreement. Therefore, the court felt constrained by the language of this Court's opinion in Ward to affirm the judgment. However, the court expressed a view that whenever there is an agreement by which the settling party is required to remain in the case, the agreement should be disclosed to the jury. The court reasoned:
Under our adversary system a jury can usually assume that the parties and their counsel are motivated by the obvious interests each has in the litigation. That assumption is no longer valid when the parties have actually made an agreement to the contrary prior to trial. The fairness of the system is undermined when the alignment of interests in the litigation is not what it appears to be.
Jurors are also deceived by being informed that they are resolving an existing dispute between parties that have already resolved their differences. In our view, this undermines the integrity of the jury system which exists to fairly resolve actual disputes between our citizens. Hence, even if the parties and counsel conduct themselves with honesty and integrity, a cloud of doubt remains over the proceedings because of the information withheld from the jurors.
Dosdourian, 580 So.2d at 872.
In deciding this case, it became necessary for us to consider in depth the ramifications of Mary Carter agreements and the effect such agreements have on the trial process. As a consequence, this Court asked the parties to submit supplemental briefs with respect to the continuing viability of Mary Carter agreements and permitted the filing of amicus curiae briefs on the subject. We now conclude that the time has come to do away with Mary Carter agreements.
Unique to the scheme of Mary Carter agreements, settling defendants retain their influence upon the outcome of the lawsuit from which they settled: so-called settling defendants continue "defending" their case. Defendants who have allegedly settled remain parties throughout the negligence suit, even through trial. As a consequence, these defendants remain able to participate in jury selection. They present witnesses and cross-examine the witnesses of the plaintiff by leading questions. They argue to the trial court the merits and demerits of motions and evidentiary objections. Most significantly, the party status of settling defendants permits them to have their counsel argue points of influence before the jury.
*244 In many instances, Mary Carter defendants may exert influences upon the adversarial process before a trial as well. They may, for example, share with a plaintiff work product previously (or subsequently, if the agreement remains secret) disclosed to them by a nonsettling defendant. The plaintiff and the settling defendant can combine their combatant energies far in advance and coerce nonsettling defendants, out of fear that they will be subject to an unfair trial, to settle for sums in excess of that which would otherwise be proportional to those defendants' fair shares of the burden.
By virtue of a Mary Carter agreement, settling defendants often acquire a substantial financial interest in a trial's outcome should the jury rule favorably for the plaintiff. See, e.g., Booth v. Mary Carter Paint Co., 202 So.2d 8 (Fla. 2d DCA 1967), rejected by Ward v. Ochoa, 284 So.2d 385 (Fla. 1973). For example, a settling defendant may agree to settle at some ceiling figure upon the condition that if the jury awards the plaintiff a judgment against the nonsettling defendant in excess of a certain amount, the settling defendant's settlement money is returned proportionately or perhaps entirely. In these instances, Mary Carter defendants desire to remain parties to the suit so that their counsel may influence the jury's verdict in favor of the plaintiff and against the nonsettling defendant.
Rather than cooperating with their codefendants to minimize the culpability of all defendants and to minimize the jury's assessment of plaintiff's damages, Mary Carter defendants offer to the plaintiff their counsel's services for the purpose of persuading the jury to apportion to nonsettling defendants the greatest percentage of fault and to award the full amount of damages the plaintiff has requested. Even possible collusion between the plaintiff and the settling defendant creates an inherently unfair trial setting that could lead to an inequitable attribution of guilt and damages to the nonsettling defendant. Watson Truck & Supply Co. v. Males, 111 N.M. 57, 801 P.2d 639, 643 (1990) (Wilson, J., specially concurring).
In addition, Mary Carter agreements, by their very nature, promote unethical practices by Florida attorneys. If a case goes to trial, the judge and jury are clearly presuming that the plaintiff and the settling defendant are adversaries and that the plaintiff is truly seeking a judgment for money damages against both defendants. In order to skillfully and successfully carry out the objectives of the Mary Carter agreement, the lawyer for the settling parties must necessarily make misrepresentations to the court and to the jury in order to maintain the charade of an adversarial relationship. These actions fly in the face of the attorney's promise to employ "means only as are consistent with truth and honor and [to] never seek to mislead the Judge or Jury by any artifice or false statement of fact or law." Oath of Admission to The Florida Bar, Florida Rules of Court 977 (West 1993). The Arizona State Bar Committee on Rules of Professional Conduct has expressly concluded that certain types of Mary Carter agreements contravene the canons of professional ethics concerned with representing conflicting interests, ensuring candor and fairness, taking technical advantage of opposing counsel, and pursuing unjustified litigation. Op. No. 70-18, Ariz. State Bar Committee on Rules of Prof. Conduct (1970). Some courts have even held that a Mary Carter agreement in which the settling defendant retains a financial interest in the plaintiff's success against the nonsettling defendant is champertous in character. Lum v. Stinnett, 87 Nev. 402, 488 P.2d 347 (1971); Elbaor v. Smith, 845 S.W.2d 240 (Tex. 1992).
Commentators have frequently criticized Mary Carter agreements. See, e.g., Warren Freedman, The Expected Demise of "Mary Carter": She Never Was Well!, 1975 Ins.L.J. 602, 603 (Mary Carter agreements are "one of the ugliest and most disreputable sides of law practice today, in the opinion of most trial lawyers."); John E. Benedict, Note, It's a Mistake to Tolerate the Mary Carter Agreement, 87 Colum.L.Rev. 368, 386 (1987) ("Mary Carter agreements distort the entire litigation process... ."); David R. Miller, Comment, Mary Carter Agreements: Unfair and Unnecessary, 32 Sw.L.J. 779, 801 (1978) ("Mary Carter agreements ... serve no worthwhile function in our judicial system... .").
*245 In a 1986 article, Professor June Entman made a comprehensive analysis of Mary Carter agreements and concluded as follows:
Mary Carter agreements defeat the policies underlying all systems of allocation of liability among tortfeasors used in the United States today. Mary Carter agreements are used purposely to defeat any system of equitable sharing and to shift liability to the nonsettling defendant through manipulation of the trial process... .
... .
... In order to give a plaintiff and codefendant the freedom of making whatever arrangement they wish in settling their dispute, the civil litigation system and the nonsettling parties must pay the price of risking perjury, confusing juries and permitting evasion of the various allocation systems designed to ensure equitable sharing of liability among tortfeasors. Because it is not possible to ensure a fair trial for the nonsettling defendant when a Mary Carter agreement is involved, and because these agreements do not fairly encourage settlements, there is no reason to permit a Mary Carter agreement to determine the relative liability of those responsible to the plaintiff. Rather, public policy and an untainted adversary trial should determine the distribution of liability among the potential obligors.
The best solution is outright prohibition of Mary Carter agreements.
June F. Entman, Mary Carter Agreements: An Assessment of Attempted Solutions, 38 U.Fla.L.Rev. 521, 574, 579 (1986).
Some courts have done exactly what Professor Entman recommends by declaring Mary Carter agreements void as against public policy. Lum, 488 P.2d 347; Elbaor, 845 S.W.2d 240; Trampey v. Wisconsin Telephone Co., 214 Wis. 210, 252 N.W. 675 (Wisc. 1934); see also Cox v. Kelsey-Hayes Co., 594 P.2d 354, 359 (Okla. 1978) (trial court must "either hold that portion of the agreement granting agreeing defendant an interest in a large plaintiff's verdict unenforceable ... or dismiss the agreeing defendant from the suit."). While acknowledging their potential for unfairness, other courts have allowed Mary Carter agreements, provided their existence is made known to the jury. E.g., Firestone Tire & Rubber Co. v. Little, 276 Ark. 511, 639 S.W.2d 726 (1982); Ratterree v. Bartlett, 238 Kan. 11, 707 P.2d 1063 (1985); General Motors Corp. v. Lahocki, 286 Md. 714, 410 A.2d 1039 (1980); Hegarty v. Campbell Soup Co., 214 Neb. 716, 335 N.W.2d 758 (1983).
The main argument in favor of Mary Carter agreements is that they promote settlement. However, while it is true that a Mary Carter agreement accomplishes a settlement with one of the defendants, the intent of the agreement is to proceed with the trial against the other. Some agreements even give the settling defendant veto authority over a prospective settlement with the other defendant. Therefore, the existence of Mary Carter agreements may result in an increased number of trials, and they certainly increase the likelihood of posttrial attacks on verdicts alleged to have been unfairly obtained as a result of such agreements. Of course, if the existence of the agreement is known, it is possible that the other defendant may feel compelled to also reach a settlement. However, in that event the remaining defendant may have been unfairly coerced into settling for more than his fair share of liability.
In Ward v. Ochoa, we endeavored to ameliorate the inherent unfairness of Mary Carter agreements by requiring disclosure and admission into evidence. However, even admitting the agreement into evidence can be a double-edged sword to the extent that it conveys a message to the jury that at least one of the defendants felt that the plaintiff's claim was meritorious. Moreover, the agreements are often worded in such a way as to paint the nonsettling defendant in a most unfavorable light before the jury. As Professor Entman stated in addressing the efficacy of this remedy:
The disclosure and admission approach to controlling Mary Carter agreements has been criticized as being insufficient to cure the prejudice to the nonsettling defendant. Admitting the Mary Carter agreement into evidence does not resolve several problems of unfairness in the trial process. Even if *246 the jurisdiction permits the nonsettling defendant to inform the jury of the agreement for impeachment purposes or to disclose the parties' true positions, courts permitting the settling defendant to remain a party defendant still may enable the settling defendant to enjoy the advantages of that position to the detriment of the nonsettling defendant. The settling defendant may still use peremptory challenges to aid the plaintiff in jury selection, thus allotting more challenges to the plaintiff's side of the litigation, and less to the defendant's, than the applicable law provides. The settling defendant may still be permitted to use leading questions to cross-examine witnesses who are not really adverse. Also, the continuing presence of the settling defendant may serve to block the nonsettling defendant from removing a case to federal court when in reality there is complete diversity of citizenship between those parties who are truly adverse.
Entman, 38 U.Fla.L.Rev. at 563 (footnotes omitted).
In light of all these arguments, we agree with the Supreme Court of Texas when it said:
Mary Carter agreements ... "present to the jury a sham of adversity between the plaintiff and one codefendant, while these parties are actually allied for the purpose of securing a substantial judgment for the plaintiff and, in some cases, exoneration for the settling defendant." The agreements pressure the "settling" defendant to alter the character of the suit by contributing discovery material, peremptory challenges, trial tactics, supportive witness examination, and jury influence to the plaintiff's cause. These procedural advantages distort the case presented before a jury that came "to court expecting to see a contest between the plaintiff and the defendants [and] instead see[s] one of the defendants cooperating with the plaintiff."
Mary Carter agreements not only allow plaintiffs to buy support for their case, they also motivate more culpable defendants to "make a `good deal' (and thus) end up paying little or nothing in damages." Remedial measures cannot overcome nor sufficiently alleviate the malignant effects that Mary Carter agreements inflict upon our adversarial system. No persuasive public policy justifies them, and they are not legitimized simply because this practice may continue in the absence of these agreements. The Mary Carter agreement is simply an unwise and champertous device that has failed to achieve its intended purpose.
Elbaor, 845 S.W.2d at 249.
We are convinced that the only effective way to eliminate the sinister influence of Mary Carter agreements is to outlaw their use. We include within our prohibition any agreement which requires the settling defendant to remain in the litigation, regardless of whether there is a specified financial incentive to do so.[2]
We recognize that until this opinion Mary Carter agreements were legal in Florida, and we are loath to penalize those who have entered into such agreements. In some instances it might even be impossible to restore the parties to the status quo if such agreements were set aside. Therefore, our holding shall be prospective only and shall not affect the legality of any such agreements that have been entered into prior to the date of this opinion. Accordingly, we must decide the instant case upon the premise that the settlement agreement was legal.
Dosdourian first argues that the trial judge erred in refusing to dismiss DeMario as a party in view of her settlement with Carsten. Carsten argues that the trial judge properly refused to dismiss the settling defendant upon the authority of Whited v. Barley, 506 So.2d 445 (Fla. 1st DCA), review denied, 515 So.2d 230 (Fla. 1987). In Whited, *247 the trial judge dismissed one of three defendants from a lawsuit because he had entered into an agreement which settled his liability at $10,000 but required him to remain as a defendant in the case. The district court of appeal held that the judge had erred in dismissing the defendant from the suit because the settlement agreement did not resolve the issue of that defendant's proportionate share of negligence.
We reject the contention that it was essential that DeMario remain in the suit in order to determine her share of negligence. For the purpose of apportioning noneconomic damages, section 768.81(3), Florida Statutes (1989),[3] requires the fault of all persons responsible for an accident to be determined regardless of whether they are parties to the litigation. Fabre v. Marin, 623 So.2d 1182 (Fla. 1993). On the other hand, prior to this opinion we know of nothing that would have precluded Carsten and DeMario from agreeing that DeMario would remain in the suit. In fact, a requirement that the settling defendant remain in the litigation is one of the ingredients of a Mary Carter agreement. The trial judge did not err in refusing to dismiss DeMario as a defendant. Nationwide Mut. Fire Ins. Co. v. Vosburgh, 480 So.2d 140 (Fla. 4th DCA 1985).
Turning to the certified question, Carsten argues that his was not a true Mary Carter agreement because it did not provide that DeMario could reduce her liability by staying in the litigation. Thus, he asserts that the agreement was more in the nature of a release or covenant not to sue which was protected from disclosure to the jury by the provisions of section 768.041(3), Florida Statutes (1989). Dosdourian argues, however, that the jury was still misled by not knowing that Carsten had settled his claim against DeMario while DeMario remained in the litigation. Dosdourian points out several instances in which she claims she was prejudiced in the eyes of the jury by the conduct of DeMario's attorney. For example, she says that it was undisputed that Carsten was jaywalking at the time of the accident, but that in closing argument DeMario's lawyer stated that Carsten had acted reasonably under the circumstances and was completely without fault. She also says that DeMario's counsel did not cross-examine any of Carsten's damage witnesses and did not make even a single argument to suggest that Carsten's damages were less than claimed.
Consistent with our decision to ban all future agreements in which the settling defendant remains in the case, we believe that the same policy reasons requiring the disclosure of secret settlement agreements in the "Mary Carter" line of cases apply here, even though the motivations of the settling parties are not as clear. While Carsten's agreement with DeMario was not the usual Mary Carter agreement, we believe that it falls within the scope of secret settlement agreements which are subject to disclosure to the trier of fact under the principles of Ward v. Ochoa. As noted by the court below, "[t]he integrity of our justice system is placed in question when a jury charged to determine the liability and damages of the parties is deprived of the knowledge that there is, in fact, no actual dispute between two out of three of the parties." Dosdourian, 580 So.2d at 872. Thus, we answer the certified question in the affirmative.
In reaching our conclusion, we do not impugn the integrity of DeMario's counsel in any way. However, even though a defendant may be required to remain in the litigation, once that defendant has agreed to settle there is simply no longer any incentive to actively defend the case. In fact, it is no longer even in the settling defendant's interest to put forth further effort or incur additional expense in the litigation. Simple inaction on the part of one defendant can adversely affect the codefendant.[4]
Thus, we declare that all Mary Carter agreements entered into after the date of *248 this opinion are void as against public policy. We quash the decision below and remand the case for a new trial. The settlement agreement shall remain intact, but it shall be admitted into evidence upon the request of Dosdourian.[5]
It is so ordered.
OVERTON, McDONALD, SHAW, KOGAN and HARDING, JJ., concur.
BARKETT, C.J., concurs specially with an opinion, in which SHAW, J., concurs.
BARKETT, Chief Justice, specially concurring.
I agree with the majority's analysis of Mary Carter agreements and with its disposition of the case under review. I write only to address the majority's conclusion that on remand, "the trial judge retains the discretion not to advise the jury of the amount of the settlement should it appear that to do so would unfairly prejudice any of the parties." Majority op. at 248 n. 5 (emphasis supplied). I believe that in almost all cases litigating valid Mary Carter agreements, discretion would dictate that although the existence of such an agreement should be disclosed, the amount of the settlement should not. Disclosure of the settlement amount in most cases is unnecessary and/or invites prejudice because a jury's liability and damages determinations are almost certainly going to be affected.
SHAW, J., concurs.
NOTES
[1] These agreements derive their name from the case of Booth v. Mary Carter Paint Co., 202 So.2d 8 (Fla. 2d DCA 1967), rejected by Ward v. Ochoa, 284 So.2d 385 (Fla. 1973), which first approved them in Florida.
[2] See John E. Benedict, Note, It's a Mistake to Tolerate a Mary Carter Agreement, 87 Colum.L.Rev. 368, 372 n. 14 (1987):

Even without a formal rebate provision, however, settling parties may enter a Mary Carter agreement to prejudice the nonsettling defendant, particularly if the settling defendant has shallow pockets. The plaintiff may accept a fixed payment from the settling defendant (typically the full extent of his insurance coverage) in exchange for his assistance in securing a large judgment against his codefendant.
[3] Apparently, section 768.81(3), which was first enacted in 1986, was not applicable in Whited.
[4] We readily acknowledge that where no settlement has been reached a defendant has no right to rely upon the actions of a codefendant. However, where, as here, there was a settlement, the jury was entitled to weigh the codefendant's actions in light of its knowledge that such a settlement has been reached.
[5] Because there are no contingencies involved, the trial judge retains the discretion not to advise the jury of the amount of the settlement should it appear that to do so would unfairly prejudice any of the parties. See Bechtel Jewelers v. Insurance Co. of N. Am., 455 So.2d 383 (Fla. 1984) (court may excise specific language of Mary Carter agreement to eliminate undue prejudice).