SHEPHERD, J.
This is an appeal from a final order directing an insured tortfeasor to write a *1102 settlement check directly to the Plaintiff without receiving a release of Medicare’s lien. We find that the decision of the lower court misinterpreted the previously negotiated Settlement Agreement between the Plaintiff, Defendant and the Defendant’s insurer, and therefore are compelled to reverse the judgment of the court below.
We are presented here with a garden variety slip and fall which settled during mediation for the sum of fifty-five thousand dollars ($55,000.00). There were thirty-seven thousand dollars ($37,000.00) worth of medical bills associated with the incident, all of which have been paid by Medicare. The mediation was attended by the Plaintiff, Edna Tripp (“Tripp”), her counsel, counsel for the Defendant, Polio Operations, Inc. (“Pollo”), and a representative of Polio’s general liability insurer, Liberty Mutual Insurance Company (“Liberty Mutual”).
The Settlement Agreement, signed by Polio’s attorney, the Liberty Mutual representative, along with Tripp, her husband, and her counsel, contained the following language:
[A]ll matters arising out of the above matter, including subrogation claims are hereby resolved as follows:
* * *
Plaintiff will execute appropriate releases and will satisfy all medical and related liens from the settlement funds. Settlement includes any claim by the claimant for medical payments coverage. Plaintiff will execute appropriate indemnity and hold harmless agreements consistent with protecting Defendant from any claim of medical lien.
This agreement, memorialized on a pre-printed mediation form designed for use in the settlement of these kinds of cases, contemplates that the parties intended that any medical liens would be satisfied from the settlement proceeds, and that any subrogated entities which had thus far been fronting medical costs would recoup their payments. In other words, these entities — whether they be hospitals, other service providers, or an apparent subrogee like Medicare — would receive some payment from the settlement proceeds to satisfy any lien against Tripp. Customarily, this is accomplished by counsel working together in good faith to negotiate, settle, and obtain releases for all medical liens as part of the settlement closing so that the defendant and, in certain circumstances, counsel are not exposed to later claims.
However, that was not to be here. Instead, after the Settlement Agreement was executed, Plaintiff and her counsel attempted to avoid the rightful claims of a medical payments subrogee — Medicare. In particular, based on a Fifth Circuit case, Thompson v. Goetzmann, 315 F.3d 457 (5th Cir.2002), opinion withdrawn, and superseded on denial of rehearing, 337 F.3d 489 (5th Cir.2003),[1] counsel for Plaintiff came up with the idea that if the Defendant-tortfeasor, Polio, wrote the settlement check directly to Plaintiff, then *1103 Medicare would be halted from seeking reimbursement.
Instead of enforcing the Settlement Agreement as written and customarily implemented, . the lower court disregarded the entities which had a subrogated interest in the outcome of the controversy and granted Plaintiffs request for an end-run around the Settlement Agreement and Medicare statute by directing that Polio deliver á check to the Plaintiff alone. In so doing, the trial court blinded itself to the ultimate reality that Liberty Mutual would be writing a check to Polio to cover the check Polio writes to the Plaintiff. We conclude that this judicially-sanctioned arrangement of an obviously insured tortfea-sor directly paying the allegedly injured Plaintiff is not only contrary to the express agreement of the parties, but also impermissible under the circumstances of this case.
In the 1980s, Congress passed several amendments to the Medicare Secondary Payer Statute (MSP) for the purpose of reducing federal healthcare costs. 42 U.S.C. § 1395y (1983). The MSP amendments make Medicare the secondary payer for its beneficiaries, and subrogates Medicare to recoup any sums it has paid out from the rightful primary payer. The relevant portion of the statute reads:
In order to recover payments made ... for an item or service, the United States may bring an action against any entity which would be responsible for payment with respect to such item or service-(or any portion thereof) under such a law, policy, plan or insurance.... The United States shall be subrogated ... to any right of an individual or any other entity to payment with respect to such item or service under such a law, policy, plan or .insurance.
42 U.S.C. § 1395y(b)(l) (1983).
Florida courts have found that the MSP applies whenever a liability insurer pays a Medicare beneficiary based on a tortfea-sor’s legal liability. Smith v. Travelers Indem. Co., 763 F.Supp. 554 (M.D.Fla.1989) (United States entitled to reimbursement for conditional Medicare payments made on behalf of beneficiary injured in automobile accident). Clearly, the United States has priority over monies paid to its Medicare beneficiaries from third parties in settlement of a tort claim, and is entitled to seek a reimbursement by either independent action, as provided for in the MSP statute, or by subrogation. Provident Life and Acc. Ins. Co. v. United States, 740 F.Supp. 492 (E.D.Tenn.1990). In the case sub judiee, treating an obviously insured tortfeasor (Polio) as possibly uninsured or a self-insured tortfeasor and directing it to pay the Plaintiff directly in order to keep Medicare in the dark, is contrary to federal law.
If, at the outset, Polio chose for its own reasons to not involve Liberty Mutual— e.g., because of the dubious merits of the claim, possibility of a simple and early resolution, or perhaps a high deductible— then Polio may have been lawfully classified as “uninsured” or “self-insured” for this claim, and the Plaintiff could arguably avail herself of Goetzmann. However, Polio did give notice to its insurer, and all parties, including the court which referred the matter to mediation,[2] conducted the litigation through the insurance prism. No party to this litigation can now ignore its direct knowledge of the existence and application of insurance.
*1104 The lower court’s proposed structuring of the settlement payment is also, at its core, unjust. If Tripp keeps the entire amount of the settlement proceeds, which was the logical outgrowth of the medical bills she accrued at the taxpayers’ expense, she would receive a windfall. See Thys-senkrupp Elevator Corp. v. Lasky, 868 So.2d 547 (Fla. 4th DCA 2003) (elevator passenger was not entitled to recover, as damages in her negligence action against the elevator company, the amount by which medical providers’ charges were reduced upon acceptance of payment from Medicare).[3] The primary purpose behind the collateral source rule is to avoid double recovery by a plaintiff. The goal should be to make a plaintiff whole, not to bestow a windfall.
A necessary corollary is that the collateral source rule also keeps the tortfeasor from gaining a benefit for which he did not contribute, like being able to reduce damages by the amount of proceeds from a private insurance policy held by the victim. Florida Physician’s Ins. Reciprocal v. Stanley, 452 So.2d 514, 515 (Fla.1984). In that limited context, though payments for the plaintiffs injuries have been made by a collateral source, the plaintiff is permitted to make a double recovery lest the tortfea-sor be completely absolved by the sheer fortuity of having injured a cautious plaintiff who advance paid for the damages that could accrue from the tortfeasor’s wrongdoing. Thus, in a sense, the collateral source rule keeps plaintiffs from profiting from their injuries, and keeps'tortfeasor-defendants from profiting by minimizing or escaping their liabilities.
Hence, the dual rationale behind the collateral source rule “simply is not applicable if the plaintiff has incurred no expense, obligation, or liability in obtaining the services for which he seeks compensation.” Stanley at 515. In that scenario, permitting a plaintiff to recover expenses she is not obligated to pay provides “an undeserved and unnecessary windfall to the plaintiff.” Florida Physician’s Ins. Reciprocal v. Stanley, 452 So.2d 514, 515 (Fla.1984) (citing Peterson v. Lou Bachrodt Chevrolet Co., 76 Ill.2d 353, 29 Ill. Dec. 444, 392 N.E.2d 1, 5 (1979) (emphasis in original)). Accordingly, with regard to the receipt of governmental benefits, the Florida Supreme Court has held that the common law collateral source rule “should be limited to those benefits earned in some way by the plaintiff. Governmental ... benefits available to all citizens ... should be [factored into the final damages calculation so as not award] an undeserved and unnecessary windfall to the plaintiff.” Stanley at 515.[4]
*1105 In this case, the effect of the lower court’s decision is antithetical to the collateral source rule. Not only did Tripp not have to pay for any medical bills, she can wield these bills to justify and inflate her demand for a settlement, and then, if she can successfully deceive Medicare, which has been paying for her benefits all along, she would be able to unfairly keep the entire proceeds. “It [is] contrary to the public purpose of reducing health care costs to allow inflated damages recoveries to stand.... ” Lasky, 868 So.2d at 550.
Additionally, we also find the procedure proposed by Tripp and summarily approved by the lower court foils Pollo and Liberty Mutual’s right to envelop the settlement. Where a third-party payer is aware that Medicare has advanced payment, and the third party and beneficiary negotiate a settlement whereby the subro-gated interests of Medicare are circumvented, the third party has been held liable to reimburse Medicare, even though the third party has already paid monies to the beneficiary. Health Ins. Assoc. of America v. Shalala, 23 F.3d 412 (D.C.Cir.1994).
A “third-party payer” which “is, or should be, aware” that Medicare has already made a payment for a service or item, and yet pays an entity other than Medicare — usually the beneficiary — is still liable for that item. 42 C.F.R. § 411.24(i)(2). If the recipient of the third-party payment fails, to reimburse Medicare within sixty days, as required under 42 C.F.R. § 411.24(h), then “the third party payer must reimburse Medicare even though it has already reimbursed the beneficiary or other party.” 42 C.F.R. § 411.24(0(1). The D.C. Circuit found that a “knowing payment by the obligor (tortfeasor) to the wrong party (the tort plaintiff) does not bar recovery by the right party ... by virtue of subrogation.” Health Ins. Assoc, of America, 23 F.3d at 418. Specifically, the language “should be ... aware” applies when “the third-party payer ‘has in its possession direct information that Medicare has made a conditional primary payment or information necessary to draw the conclusion that Medicare has made a conditional primary payment.’ ” Id. (citation omitted). Thus, a victim’s release would not bar the subrogee’s, i.e., Medicare’s, right of recovery from the tortfeasor and the tortfeasor’s insurer as long as the release was obtained “with knowledge, actual or constructive,” of the fact that another entity, i.e., Medicare, already paid for the victim’s losses. Id. at 418 (emphasis in original).
Because Liberty Mutual and its insured, Pollo,' are clearly aware that Medicare paid the medical bills that Plaintiff associates with her alleged slip and fall, the decision of the lower court places Liberty Mutual in a catch-22 and exposes the company to additional liability. If it follows the directives of the lower court and has its insured, Polio, deliver to Plaintiff .a check in hopes that Plaintiff will turn around and pay Medicare, Liberty Mutual exposes itself to paying off Tripp’s Medicare lien in the event Tripp herself does not. Leaving Liberty Mutual to then try to enforce the Settlement Agreement’s indemnity clause to get justice is likely a vain hope with the normal plaintiff, who by then will probably have spent the proceeds. This is one of the reasons that most settling counsel almost always involve Medicare in the settlement of these claims, and demand a concurrent release from Medicare and other similarly situated subrogees, so that all interested parties are “in the know” and can receive their fair share in the settlement.
Lastly, authority from our Supreme Court suggests that the purposeful avoidance by an attorney of a pay off of a *1106 federal lien can expose counsel to potentially troublesome personal and ethical consequences. The Florida Bar v. Sweeney, 730 So.2d 1269 (Fla.1998). In Sweeney, the Florida Supreme Court found that the attorney’s actions in not paying a hospital because of the belief that Medicaid would eventually pay “was an intended fraud on the State’s medicaid fund.” 730 So.2d at 1272. “By misdirecting the settlement funds owed ... to Medicaid, [the attorney] clearly created the possibility [of future] harm.” Id. We are loath to permit the courts of this state to become blessing machines for such conduct.
We therefore find the decision of the lower court to be in error and reverse and remand for further proceedings consistent herewith, including a notification to Medicare of the underlying settlement so that it can receive at least a portion of the amount due it.
Reversed and remanded.
FLETCHER, J., concurs.

. In general, Medicare has a subrogated interest or right to settlement payments received by a Medicare beneficiary, if the settlement payments were through insurance plans that provided primary medical coverage, whether they be a group health care plan, workers' compensation, liability insurance or a self-insured plan. See Medicare Secondary Payer Statute, 42 U.S.C. § 1395y. The Fifth Circuit in Goetzmann affirmed the dismissal of the government's claim that a de facto “self-insurance plan” existed by virtue of a tortfeasor-defendant, who, though lacking separate liability coverage, still made settlement payments to an injured plaintiff who was a Medicare recipient. See also United States v. Baxter International, Inc., 345 F.3d 866 (11th Cir.2003).

. The Order of Referral to Mediation commanded that each party or a representative of each party with authority to settle the case be present, and expressly provided that "If insur-anee is involved, an adjuster with authority up to the policy limits or the most recent demand, whichever is lower, shall attend.”

. Fla. Stat. §§ 768.76(1) and (2)(b) excludes Medicare benefits from being considered a collateral source, not for the purpose of allowing the plaintiff a double recovery, but because the federal government has a right of reimbursement from a plaintiff's right of recovery for payments Medicare had previously made on behalf of the plaintiff. In that light, the lower court’s order is called into question because had Tripp gone to trial and received the same amount from a jury as she did in the mediated settlement, then while the lower court under state law could not have reduced her jury award by the amount paid by Medicare due to §§ 768.76(1) and (2)(b), her judgment received would nevertheless be subject to a lien or right of reimbursement from Medicare. Thus, subsequent to a trial, if Tripp did not pay Medicare, then she would have, in essence, received a windfall.

. We acknowledge that this court has in the past viewed Florida’s collateral source rule as precluding the introduction or consideration of Medicare costs paid for a plaintiff in a personal jury trial. See Winston Towers 100 Assoc., Inc. v. De Carlo, 481 So.2d 1261 (Fla. 3d DCA 1986). However, Florida’s collateral source rule is preempted by the federal Medicare statute, and any judgment the plaintiff receives which included the amounts paid by Medicare would still be subject to a lien. See Smith v. Travelers Indem. Co., 763 F.Supp. 554, 558 (M.D.Fla.1989) ("the federal Medicare statute pre-empts Florida’s collateral *1105 source rule [to not] obstruct[] the Congressional purpose behind section 1395y(b)(l)”).