LaROSE, Judge.
Packaging Corporation of America (PCA) and its insurers appeal the final judgment awarding $5,165,413 in damages plus $400,000 in attorney’s fees and $110,000 in costs to Gayle DeRycke as personal representative of the Estate of Douglas DeRycke. We find merit in PCA’s arguments that the trial court erred in directing a liability verdict against PCA, in refusing to allow disclosure to the jury of a conditional settlement agreement, in denying PCA’s motion to offset damages with sums obtained from a collateral source, and in awarding attorney’s fees to Mrs. DeRycke. We affirm, without further discussion, two other issues presented on appeal by PCA. Athough we recognize that our decision will bring no immediate closure for Mrs. DeRycke, we are compelled to affirm in part, reverse in part, and remand for a new trial.

Factual Background

This case arises from a tragic automobile accident in which Mr. DeRycke was killed. Mr. DeRycke lived in New York; he worked for and was a shareholder of Buckeye Corrugated, Inc. Randall Knight lived in New Hampshire and worked for PCA. Mr. DeRycke and Mr. Knight were very close friends and business associates. In January 2001, Mr. DeRycke, Mr. Knight, and their spouses travelled to Florida. On January 18, 2001, Mr. Knight was driving everyone back to St. Peters-burg after dinner in Tampa. His vehicle overturned, killing Mr. DeRycke.
In 2002, Mrs. DeRycke, as personal representative, sued Mr. Knight; she sued PCA on a vicarious liability theory. Mr. Knight denied liability and asserted that a phantom vehicle caused the crash. PCA denied that Mr. Knight was acting within the course and scope of his employment.
A jury trial took place in December 2008. Mr. Knight admitted negligence and did not contest damages. PCA continued to deny liability and also asserted the phantom vehicle defense. Vernon Sum-walt, a former PCA vice-president who had retired and lived in South Carolina, was PCA’s corporate representative at trial. Mrs. DeRycke’s counsel had deposed Mr. Sumwalt several years before. At trial, Mr. Sumwalt unexpectedly testified that Mr. Knight caused the crash and Mr. DeR-ycke’s death. He also conceded that if Mr. Knight and Mr. DeRycke discussed business at dinner before the crash, it could have been a business-related dinner.
During his testimony, Mr. Sumwalt violated an order prohibiting any reference to Mrs. DeRycke’s settlement with another party. The trial court held Mr. Sumwalt in contempt. For a variety of reasons, the trial court eventually declared a mistrial. Thereafter, the trial judge recused himself. The judge to whom the case was transferred ordered retrial for June 2009 on the issues of the scope of Mr. Knight’s employment with PCA at the time of the crash and damages.
In anticipation of the retrial, PCA identified Mr. Sumwalt as its corporate representative. It came as no surprise, therefore, that at the May 13, 2009, pretrial conference, the trial court ordered PCA to produce Mr. Sumwalt for trial. Mrs. DeR-ycke’s counsel served Mr. Sumwalt with a South Carolina subpoena for video testimony to be shown live to the jury via a satellite feed. Mr. Sumwalt told the process server that he could not be in South Carolina for video testimony because he was supposed to be in St. Petersburg for the trial. At this point, the parties anticipated Mr. Sumwalt’s participation at the second trial.
Mr. Sumwalt, apparently, had a change of heart. In a May 29, 2009, letter, PCA’s counsel advised Mrs. DeRycke’s counsel *289 that Mr. Sumwalt now claimed to have scheduling conflicts. Mrs. DeRycke’s counsel reminded PCA that the trial court had ordered Mr. Sumwalt to attend trial and sought assurances that he would honor the subpoena to testify. PCA’s counsel responded that he was making an effort to have Mr. Sumwalt appear at trial, but that PCA could not force Mr. Sumwalt to do so; he was retired and lived outside of Florida.
On June 1, 2009, Mr. Sumwalt, through his own counsel, filed a motion in South Carolina state court to quash the subpoena. PCA’s counsel informed Mrs. DeR-ycke’s counsel on June 3 that Mr. Sumwalt indicated he might be in Iowa at the time of trial. Mrs. DeRycke’s counsel moved to enforce the Florida trial court’s order requiring Mr. Sumwalt to appear at trial or, in the alternative, for sanctions.
At a June 4, 2009, hearing, the trial court reiterated that PCA must produce Mr. Sumwalt. PCA argued that Mr. Sum-walt was a former employee who had a bad experience with the court at the first trial, that he no longer wanted to be involved, and that PCA had no control over him. PCA objected to any sanctions if Mr. Sum-walt did not appear. PCA’s counsel recounted that he had been unsuccessful in reaching Mr. Sumwalt’s personal attorney. He tried to make arrangements for Mr. Sumwalt to appear. Mrs. DeRycke’s counsel again offered to allow Mr. Sumwalt to appear by video. PCA agreed to video testimony but repeated that it had no power to make him appear. PCA conceded, however, that it might be bound by Mr. Sumwalt’s previous testimony.
The trial court was unmoved. It stated that Mr. Sumwalt must appear and testify as PCA’s corporate representative. If he refused, the trial court would issue a bench warrant for his arrest. Finally, the trial court warned that PCA could be defaulted if it did not produce Mr. Sumwalt.
The next day, on June 5, 2009, the South Carolina court granted Mr. Sumwalt’s motion to quash the South Carolina subpoena and “granted protection ■ from any obligations to appear and give testimony at either trial or through video deposition.” The South Carolina court noted that the subpoena was unduly burdensome because Mr. Sumwalt had already testified at a deposition and at the first trial and that Mr. Sumwalt was going to be in Iowa to deal with a family health matter.
On the morning of trial, it was clear that Mr. Sumwalt would not appear. Mrs. DeRycke moved for a directed verdict against PCA. PCA repeated that it could not force Mr. Sumwalt to attend. PCA argued that Mr. Sumwalt’s absence would not unduly prejudice Mrs. DeRycke because she could use his deposition and prior trial testimony. PCA assured the trial court that it would not contest any of his prior testimony. The trial court granted the motion and proceeded on the damages issue only. Two damages-related issues surfaced on retrial. We will discuss these issues in more detail as we proceed.
The jury returned a verdict in favor of Mrs. DeRycke. Subsequently, the trial court entered a final judgment for $5,165,413. It awarded her $400,000 in attorney’s fees under a prior proposal for settlement and $110,000 in costs. See § 768.79, Fla. Stat. (2009); Fla. R. Civ. P. 1.442.

Directed Liability Verdict

PCA argues that the trial court erred in directing a liability verdict against it. We agree. “A deliberate and contumacious disregard of the court’s authority will justify application of this severest of sanctions, as will bad faith, willful disregard or gross indifference to an order of the court, or conduct which evinces deliberate callousness.” Mercer v. Raine, 443 *290 So.2d 944, 946 (Fla.1983) (citations omitted). Yet, “the imposition of the most severe sanctions ... should be reserved for those occasions where the violation is flagrant, persistent, willful or otherwise aggravated.” Alvarez v. Alvarez, 638 So.2d 153, 153 (Fla. 2d DCA 1994); see Carazo v. Status Shipping, Ltd., 613 So.2d 1329, 1330 (Fla. 2d DCA 1992). “Absent evidence of a willful failure to comply or extensive prejudice to the opposition, however, the granting of such an order constitutes an abuse of discretion.” Kamhi v. Waterview Towers Condo. Ass’n, 793 So.2d 1033, 1036 (Fla. 4th DCA 2001); see Insua v. World Wide Air, Inc., 582 So.2d 102, 103 (Fla. 2d DCA 1991).
PCA could not compel Mr. Sum-walt to testify at trial. It had “no method to compel an out-of-state witness to testify in a civil proceeding.” See Washington v. State, 973 So.2d 611, 613 (Fla. 3d DCA 2008); see also Scripto Tokai Corp. v. Cayo, 623 So.2d 828, 828-29 (Fla. 3d DCA 1993) (holding trial court departed from essential requirements of law by ordering Scripto to produce nonresident former corporate officer for videotape deposition because it was legally unable to procure his attendance). Mr. Sumwalt wanted to disengage himself from the proceedings. The South Carolina court accommodated him. “[JJudicial acts of courts in other states, properly exercising their jurisdiction, should be respected under the comity doctrine” where not inconsistent with Florida public policy interests. Jeep Corp. v. Sanders, 546 So.2d 1098, 1099 (Fla. 5th DCA 1989) (reversing, on comity grounds, trial court’s order directing American Motors Corporation to allow ex-employee to testify for plaintiffs in suit against Jeep despite Ohio injunction precluding ex-employee from testifying).
The trial court exceeded its authority in directing a liability verdict. PCA explained its efforts to secure Mr. Sumwalt’s attendance and its inability to force him to appear. Quite simply, Mr. Sumwalt refused to participate further. See Herold v. Computer Components Int’l, Inc., 252 So.2d 576 (Fla. 4th DCA 1971) (holding trial court exceeded its proper discretion in dismissing case where plaintiff attempted to comply with order and sought to explain inability to do so). There was no showing that Mr. Sumwalt’s nonappearance would unduly prejudice Mrs. DeR-ycke. See Alvarez, 638 So.2d at 153-54. She could use Mr. Sumwalt’s prior deposition and trial testimony, which PCA agreed not to challenge. We must also note that our record is devoid of any facts suggesting that PCA orchestrated or otherwise played any role in Mr. Sumwalt’s decision not to provide testimony at the second trial.
As we did in Alvarez, we must conclude that the imposed sanction was unwarranted. See id. at 154. We are sympathetic to the fact that Mrs. DeRycke undoubtedly has endured turmoil in these proceedings. Nonetheless, we must reverse and remand for a new trial.

Mary Carter Agreement

Before the damages trial, Mrs. DeRycke moved in limine to prohibit any reference to settlement discussions. Responding to the trial court’s question of whether there was a settlement between Mrs. DeRycke and Mr. Knight, counsel advised as follows:
We don’t have a settlement. What we have is an agreement by the Plaintiff not to hold Mr. Knight responsible for a judgment in excess of his insurance coverage in return for his admission of liability and his agreement not to contest damages.... We will not know if he contests damages until the last testimony in the case is done.
*291 Mr. Knight’s counsel labeled the arrangement a “conditional agreement.” Mr. Knight remained a party in the suit. PCA objected to the nondisclosure of the agreement to the jury based on the “Mary Carter” line of cases. The trial court granted the motion in limine, prohibiting disclosure of the agreement to the jury. It observed, however, that if settlement were reached during trial, it might tell the jury. PCA appeals that ruling. No discussion of the agreement occurred at trial, and it was not revealed to the jury.
The term “Mary Carter agreement” originated in Booth v. Mary Carter Paint Co., 202 So.2d 8 (Fla. 2d DCA 1967).[1] There, the plaintiff agreed to limit the financial liability of two defendants and they agreed to continue as active defendants until all liability and damages questions were resolved between the plaintiff and the remaining defendants. Id. at 10. This “conditional agreement” would not be construed as a settlement and would not be revealed to the jury. Id. In Ward v. Ochoa, 284 So.2d 385, 387-88 (Fla.1973), the supreme court described a Mary Carter agreement in terms particularly applicable to the agreement between Mrs. DeR-ycke and Mr. Knight:
A “Mary Carter Agreement” ... is basically a contract by which one codefen-dant secretly agrees with the plaintiff that, if such defendant will proceed to defend himself in court, his own maximum liability will be diminished proportionately by increasing the liability of the other codefendants. Secrecy is the essence of such an arrangement, because the court or jury as trier of the facts, if apprised of this, would likely weigh differently the testimony and conduct of the signing defendant as related to the nonsigning defendants. By painting a gruesome testimonial picture of the other defendant’s misconduct or, in some cases, by admissions against himself and the other defendants, he could diminish or eliminate his own liability by use of the secret “Mary Carter Agreement.”
Id. at 387.
[Sjettling parties may enter a Mary Carter agreement to prejudice the nonset-tling defendant, particularly if the settling defendant has shallow pockets. The plaintiff may accept a fixed payment from the settling defendant (typically the full extent of his insurance coverage) in exchange for his assistance in securing a large judgment against his code-fendant.
John E. Benedict, Note, “It’s a Mistake to Tolerate the Mary Carter Agreement,” 87 Colum. L. Rev. 368, 372 n. 14 (1987). The Ochoa court concluded that Mary Carter agreements tend to mislead juries and judges and border on collusion and held that they would be admissible in evidence at the request of any other defendant who stood to lose as a result of such an agreement. 284 So.2d at 387-88.
Twenty years after Ochoa, the supreme court revisited Mary Carter agreements in Dosdourian v. Carsten, 624 So.2d 241 (Fla.1993). That case involved an agreement by the plaintiff to settle all claims against one defendant in return for payment of her insurance policy limits and her continued participation in the litigation. Id. at 242. The trial court ruled that the agreement need not be disclosed to the jury unless the plaintiff called the settling defendant to testify at trial. Id. On appeal, the non- *292 settling defendant argued that the trial court should have told the jury about the agreement. Id. The supreme court reversed and remanded for a new trial, concluding that “ ‘[t]he integrity of our justice system is placed in question when a jury charged to determine the liability and damages of the parties is deprived of the knowledge that there is, in fact, no actual dispute between two out of three of the parties.’ ” Id. at 247 (quoting Dosdourian v. Carsten, 580 So.2d 869, 872 (Fla. 4th DCA 1991)). The supreme court reasoned that the settling codefendant could influence the trial; even “[sjimple inaction on the part of one defendant can adversely affect the codefendant.” Id. at 247. The court explained further as follows:
Mary Carter agreements defeat the policies underlying all systems of allocation of liability among tortfeasors used in the United States today. Mary Carter agreements are used purposely to defeat any system of equitable sharing and to shift liability to the nonsettling defendant through manipulation of the trial process....
[[Image here]]
... In order to give a plaintiff and codefendant the freedom of making whatever arrangement they wish in settling their dispute, the civil litigation system and the nonsettling parties must pay the price of risking perjury, confusing juries and permitting evasion of the various allocation systems designed to ensure equitable sharing of liability among tortfeasors. Because it is not possible to ensure a fair trial for the nonsettling defendant when a Mary Carter agreement is involved, and because these agreements do not fairly encourage settlements, there is no reason to permit a Mary Carter agreement to determine the relative liability of those responsible to the plaintiff. Rather, public policy and an untainted adversary trial should determine the distribution of liability among the potential obligors.
The best solution is outright prohibition of Mary Carter agreements.
Id. at 245 (quoting June F. Entman, “Mary Carier Agreements: An Assessment of Attempted, Solutions,” 38 U. Fla. L. Rev. 521, 574, 579 (1986)). Dosdourian left the agreement intact and ordered that it be admitted into evidence at Dosdouri-an’s request but held that Florida courts would no longer recognize Mary Carter agreements. Id. at 246-48.
As with the agreement in Dosdou-rian, the agreement between Mrs. DeR-ycke and Mr. Knight limits his exposure in return for his continued participation in the litigation and various concessions on liability and damages. See 624 So.2d at 242; cf. La Costa Beach Club Resort Condo. Ass’n v. Carioti, 37 So.3d 303 (Fla. 4th DCA 2010) (holding settlement agreement between association and one officer was not an illegal Mary Carter agreement where it required only that officer make himself available for trial but not his full trial participation and where officer testified that he had settled and was no longer a defendant). Based on Dosdourian, PCA argues that if adversarial parties enter into a Mary Carter agreement, it must be disclosed to the jury. We note that Dos-dourian allowed the Mary Carter agreement to remain intact and ordered disclosure. Id. at 247-48. We also note that the parties did not argue below nor did they raise on appeal any issue as to whether the agreement was against public policy. See, e.g., Nieves v. Snapp Indus., Inc., 929 So.2d 623, 624 (Fla. 3d DCA 2006) (holding that trial court correctly denied motion by one of several defendants to enforce agreement, barred as a matter of law, that defendant would pay plaintiff $5000 in exchange for defendant’s agree *293 ment not to oppose summary judgment). Nevertheless, post-Dosdourian decisions compel us to conclude that the agreement with Mr. Knight was subject to disclosure.
In Goodyear Tire & Rubber Co. v. Ross, 660 So.2d 1109, 1110 (Fla. 4th DCA 1995), the plaintiff settled with one defendant before trial but did not dismiss that defendant from the trial until after she read the defendant’s responses to pretrial requests for admissions. The plaintiff persuaded the trial court that the settlement should not be disclosed to the jury. Id. The Fourth District, citing Dosdourian, reversed, holding that the failure to disclose the settlement agreement required a new trial. Id. at 1111; see also Naghtin v. Jones, 629 So.2d 1109 (Fla. 1st DCA 1994) (reversing and remanding for a new trial because trial court abused its discretion by failing to disclose to the jury plaintiffs settlement with defendant who remained in trial); cf. Peterson v. Morton F. Plant Hosp. Ass’n, 656 So.2d 501, 503 (Fla. 2d DCA 1995) (holding settlement not yet reduced to writing but where settling defendant remained only nominal defendant and played no role in trial was not Mary Carter agreement that must be disclosed to jury)-
The trial court erred in precluding disclosure of the agreement to the jury. We reverse the trial court’s ruling, but we leave the enforceability question for the trial court to address at retrial if raised by the parties.

Collateral Source Offset

Upon Mr. DeRycke’s death, his employer, Buckeye, paid his estate $941,760 for the book value of his company stock. To fund the stock repurchase, Buckeye used a portion of the proceeds of insurance policies it had purchased for itself designated for that purpose. Mrs. DeRycke sued Buckeye in Ohio state court, claiming that she was entitled to all proceeds from these policies. The Ohio Ninth Judicial District Court of Appeals agreed. It held that, under Buckeye’s Code of Regulations, the purchase price of stock from a deceased shareholder was the stock’s book value plus the amount of life insurance proceeds payable to Buckeye on account of the shareholder’s death.[2] Buckeye Corrugated, Inc. v. DeRycke, No. 21459, 2003 WL 22797246, at *4-6 (Ohio Ct.App. Nov. 26, 2003). The Ohio court held that Buckeye must pay Mrs. DeRycke an additional $734,980, plus interest. Id. The proceeds of several other life insurance policies Buckeye had purchased for Mr. DeRycke, payable to the beneficiary of his choice, were also paid to the estate. Id. at *1.
At trial, PCA sought to offset the additional funds that Mrs. DeRycke received from the Buckeye insurance policies against the economic damages awarded by the jury for loss of income stemming from the premature sale of the stock. See § 768.76, Fla. Stat. (2009) (providing for reduction in damages award for amounts already paid to claimant from collateral sources). Section 768.76 provides, in part, as follows:
(1) In any action to which this part applies in which liability is admitted or is determined by the trier of fact and in *294 which damages are awarded to compensate the claimant for losses sustained, the court shall reduce the amount of such award by the total of all amounts which have been paid for the benefit of the claimant, or which are otherwise available to the claimant, from all collateral sources....
(2) For purposes of this section:
(a) “Collateral sources” means any payments made to the claimant, or made on the claimant’s behalf, by or pursuant to:
1. The United States Social Security Act, except Title XVIII and Title XIX; any federal, state, or local income disability act; or any other public programs providing medical expenses, disability payments, or other similar benefits, except those prohibited by federal law and those expressly excluded by law as collateral sources.
2. Any health, sickness, or income disability insurance; automobile accident insurance that provides health benefits or income disability coverage; and any other similar insurance benefits, except life insurance benefits available to the claimant, whether purchased by her or him or provided by others.
3. Any contract or agreement of any group, organization, partnership, or corporation to provide, pay for, or reimburse the costs of hospital, medical, dental, or other health care services.
4. Any contractual or voluntary wage continuation plan provided by employers or by any other system intended to provide wages during a period of disability.
The trial court denied the motion for setoff because it found that the additional monies were life insurance policy proceeds excluded from setoff under section 768.76(2). PCA appeals that ruling.
We review the trial court’s construction of a statute de novo. Pinnacle Floor Covering, Inc. v. Dep’t of Transp., 16 So.3d 919, 921 (Fla. 2d DCA 2009). The funds at issue were not insurance proceeds paid directly to Mr. DeRycke’s estate. Buckeye was both the owner and beneficiary of these policies; the shareholder agreement obligated it to use the proceeds to repurchase Mr. DeRycke’s stock. The Ohio state court’s ruling settled the issue of stock valuation. The additional sums paid to the estate do not fall within the life insurance exception to the collateral source rule.
The jury awarded Mrs. DeRycke $692,308 in damages for her loss due to the premature sale of the stock. However, she already had been compensated $734,980 more than the book value of the stock. To allow double recovery would be a windfall for Mrs. DeRycke. See Pollo Operations, Inc. v. Tripp, 906 So.2d 1101, 1104 (Fla. 3d DCA 2005) (“The primary purpose behind the collateral source rule is to avoid double recovery by a plaintiff. The goal should be to make a plaintiff whole, not to bestow a windfall.”). Accordingly, we reverse the trial court’s ruling on this issue. On remand, the trial court shall offset this amount against any economic damages the jury awards for loss of income from the premature sale of the stock.

Attorney’s Fees

Pursuant to Mrs. DeRycke’s proposal for settlement, the trial court entered a judgment awarding her $400,000 in fees and $110,000 in costs. Because we are reversing and remanding for a new trial, we must, necessarily, reverse the award of fees and costs. See ARC Foods, Inc. v. MGI Props., 746 So.2d 514, 514 (Fla. 2d DCA 1999).
*295 Affirmed in part, reversed in part, and remanded for a new trial.
WALLACE and BLACK, JJ., Concur.

. Booth v. Mary Carter Paint Co., 202 So.2d 8 (Fla. 2d DCA 1967), rejected by Ward v. Ochoa, 284 So.2d 385 (Fla.1973) (holding Mary Carter agreements must be disclosed to jury upon proper motion), abrogated by Dosdourian v. Carsten, 624 So.2d 241 (Fla.1993) (holding Mary Carter agreements void and inadmissible).

. Section 14.3(A) of the Code of Regulations provided that the purchase price, when purchased by Buckeye or another shareholder, was the stock’s value as determined by a majority shareholder vote at the annual meeting based on the Valuation Report. Section 14.3(B) provided that, if a share was purchased from a deceased shareholder and Buckeye owned an insurance policy on his life, the section 14.3(A) purchase price was to be increased by the difference between the book value of the policy and the amount of life insurance proceeds payable. Buckeye Corrugated, Inc. v. DeRycke, No. 21459, 2003 WL 22797246, at *4 (Ohio Ct.App. Nov. 26, 2003).