953 So.2d 590 (2007)
GULF INDUSTRIES, INC., Appellant,
v.
Jayachandran NAIR, Sreelatha Nair, his wife, and Travelers Property & Casualty Company, Appellees.
No. 4D05-2433.
District Court of Appeal of Florida, Fourth District.
March 7, 2007.
Mark Hicks, Susan Y. Marcus, Cindy L. Ebenfeld of Hicks & Kneale, P.A., Miami, and Bart Cozad of Peterson Bernard, West Palm Beach, for appellant.
Julie H. Littky-Rubin of Lytal, Reiter, Clark, Fountain & Williams, LLP, West Palm Beach, for appellees.
POLEN, J.
Appellant Gulf Industries, Inc. ("Gulf") timely appeals a final money judgment against it in a personal injury jury trial in favor of co-plaintiffs/appellees Jayachandran and Sreelatha Nair ("the Nairs"). We affirm.
The dispute at issue in this appeal arose out of three motor vehicle accidents in which plaintiff/appellee Jayachandran Nair ("Nair") was the victim. The first accident occurred on July 17, 1999; the second September 1, 2000; and the third August 20, 2002. Nair underwent lumbar fusion *592 surgery on November 6, 2000 and a cervical fusion on March 5, 2003 as a result of injuries he sustained in these accidents.
Because there was no dispute that the first two accidents were caused by uninsured motorists, Travelers Property & Casualty Company ("Travelers"), which provided Nair with uninsured motorist coverage, defended both those claims. Travelers admitted that the uninsured motorists were at fault for the first two accidents and hence, that it was responsible for all damages/injuries caused by those accidents. Gulf admitted responsibility for causing the third accident and thus defended that claim.[1] However, since Nair sustained injuries which predated the third accident, Gulf argued that Nair's need for the second surgery was not caused entirely by the third accident. Gulf further disputed that it was entirely responsible for Nair's present and future medical problems. Finally, Gulf challenged Nair's assessment of economic damages.
Following trial, the jury returned a verdict of $6,971,495. It apportioned damages against Travelers (attributed to the first two accidents) in the amount of $2,714,637 and against Gulf (attributed to the third accident) in the amount of $4,256,858. After setting off personal injury protection ("PIP") benefits, disability payments and bodily injury coverage, the trial court entered an amended final judgment ("final judgment") against Gulf for $4,204,238 and against Travelers for $2,634,637. The trial court also awarded costs in the amount of $69,465.89 against each defendant.

High-Low Agreement
The first issue on appeal concerns a secret "high-low" agreement entered into between the Nairs and Travelers. The agreement provided a minimum payment to the Nairs of $1,000,000 irrespective of the jury's ultimate verdict, and capped Travelers' liability for damages caused by the first two accidents at $2,000,000 total. During the course of the trial, Gulf's counsel asked the other parties whether there were any settlement agreements among them. Both the Nairs' counsel and Travelers' counsel disclosed the agreement and Gulf consequently moved for mistrial, in the alternative asking the trial court to disclose the agreement to the jury. But the court denied the motion and refused disclosure. Gulf now appeals the denial of its motion and its request for publication to the jury.
A trial court's determination regarding admissibility of evidence is subject to an abuse of discretion standard of review. Vavrus v. City of Palm Beach Gardens, 927 So.2d 992, 995 (Fla. 4th DCA 2006) (citation omitted). The same standard applies to a trial court's ruling on a motion for mistrial. Goodwin v. State, 751 So.2d 537, 546 (Fla.1999) (citations omitted). However, whether a high-low agreement is permissible as a matter of law and/or must be disclosed to the jury is reviewed de novo. See Garrett v. Mohammed, 686 So.2d 629, 629 (Fla. 5th DCA 1996) (concluding that the trial court did not err in denying defendant's motion for a mistrial where a high-low agreement had not been disclosed prior to trial), overruled on other grounds, Allstate Ins. Co. v. Sarkis, 809 So.2d 6, 7 (Fla. 5th DCA 2001).
Gulf concedes that the high-low agreement secretly executed by Travelers and the Nairs is not a "Mary Carter agreement" because it does not contain a proportionate *593 liability shifting feature, and therefore is not explicitly proscribed by Dosdourian v. Carsten, 624 So.2d 241 (Fla. 1993).[2] Nevertheless, Gulf contends that high-low agreements invoke the same dangers posed by Mary Carter agreements and should therefore be banned in accordance with Dosdourian where a co-defendant(s) is not a party to the agreement. See id. In the alternative, Gulf asserts that, at the very least, this court should reverse and direct the trial court to grant a mistrial for failing to permit disclosure of the agreement to the jury.
The Florida Supreme Court in Dosdourian did not specifically outlaw high-low agreements in addition to Mary Carter agreements. See Garrett, 686 So.2d at 630 n. 2. This is because Dosdourian did not address 27th Ave. Gulf Service Center v. Smellie, 510 So.2d 996, 998 (Fla. 3d DCA 1987), wherein the Third District upheld the use of high-low agreements. Garrett, 686 So.2d at 630 n. 2. Addressing the question of whether high-low agreements are still permissible in light of Dosdourian, the Fifth District stated that the answer "perhaps . . . should turn on a case by case analysis of whether such agreements are in fact true settlements." Id. The Fifth District continued:
In deciding whether the agreements are true settlements, the trial court should consider whether the agreement requires the co-defendant to participate in the trial. In other words, is the high range of the agreement contingent on participation in the trial. The trial court should also consider the amount in controversy as a result of the agreement. The greater the window between the "high" and the "low" limits of the agreement, the more incentive a co-defendant has in genuinely and aggressively litigating the dispute. If the trial court concludes that the "high-low agreement" is not a settlement and the co-defendant still has a genuine incentive to defend, then in our view the agreement would not be prohibited by Dosdourian.

Id.
In this case, the high-low agreement did not require Travelers to participate in the trial; Travelers could present a defense or withdraw and simply stand on the agreement. Furthermore, the $1,000,000 range between the high and low limits of the agreement suggests that Travelers had a genuine incentive to defend itself against fault resulting from the first and second accidents. Cf. Cardona v. Metro Transit Agency, 680 So.2d 1098, 1099 (Fla. 3d DCA 1996) (reversing trial court's refusal to enforce high-low agreement where agreement set settling defendants' liability at a range of no more than $100,000 and no less than $15,000). Based on these considerations, we find that the high-low agreement was not prohibited.
The next, and perhaps more contentious, question is whether trial courts should permit nonsettling defendants to disclose high-low agreements to juries. The answer, however, is not perfectly clear, and a study of the admissibility of high-low agreements in other states demonstrates that there is no consensus on the issue. Compare Reynolds v. Amchem Prods., Inc., 32 A.D.3d 1268, 1269, 822 N.Y.S.2d 216 (2006) ("Absent evidence of collusion between the co-defendant and plaintiffs to the detriment of the company, *594 the failure to disclose the high-low agreement did not mandate reversal."), Monti v. Wenkert, 2006 WL 3908564, *14, 2006 Conn.Super. LEXIS 3849, 45-6 (Conn.Super.Ct.2006) (In upholding use of high-low agreement without disclosure to nonsettling defendant: "If the true alignment of the codefendants is apparent to the parties, the court and the jury, introduction of the agreement to the jury is unnecessary because there is no prejudice to be avoided."), and Ziegler v. Wendel Poultry Servs., Inc., 67 Ohio St.3d 10, 17, 615 N.E.2d 1022 (Ohio 1993) (holding high-low settlement agreement between estate and company was not a Mary Carter agreement and it was not erroneous to have allowed the company to participate in the trial or by failing to disclose the agreement to the jury), with Hashem v. Les Stanford Oldsmobile, Inc., 266 Mich.App. 61, 84-85, 697 N.W.2d 558 (Mich.Ct.App.2005) (requiring disclosure of high-low agreement to prevent distortion of the adversarial process and preserve integrity of the judicial system), Gen. Motors Corp. v. Lahocki, 286 Md. 714, 410 A.2d 1039 (Md. 1980) (stating that disclosure was required to allow jury to judge the credibility of witnesses), and Mustang Equip., Inc. v. Welch, 115 Ariz. 206, 210, 564 P.2d 895 (Ariz.1977) ("[T]he disclosure of [pretrial] agreements is or should be required to avoid the inherent tendency to work a fraud on the court and to avoid "collusion" between the plaintiff and some of the defendants") (citing Ward v. Ochoa, 284 So.2d 385 (Fla.1973)).
The lack of accord concerning publication of high-low agreements is perhaps due to underlying and often conflicting policy considerations. On one hand, secret agreements between plaintiffs and one or more of several defendants can mislead the jury and may "border on collusion," thereby robbing the judicial system to some extent of its truth-seeking function. See Hashem, Lahocki and Welch, supra; see also Ward, 284 So.2d at 388 ("The search for the truth, in order to give justice to the litigants, is the primary duty of the courts.").
Yet, while disclosure may avoid collusion between plaintiffs and settling defendants, see Welch, 115 Ariz. at 210, 564 P.2d 895, it may also lead the jury to believe that those plaintiffs and settling defendants conspired to prevent a fair trial. Luis F. Collins, Admissibility of High/Low Settlements, Fla. B.J., Jan. 1993, at 37. Disclosure may also detract from the benefits high-low agreements bestow because the knowledge that such agreements will be viewed by the jury might deter parties from entering into them to begin with. For instance, the high-low agreement enables parties to manage the risks of litigation and essentially "amounts to insurance against a catastrophic verdict, with the premium being the surrender of total victory." Stephen C. Yeazell, The Changing Landscape of the Practice, Financing and Ethics of Civil Litigation in the Wake of the Tobacco Wars: Seventh Annual Clifford Symposium on Tort Law and Social Policy: Re-financing Civil Litigation, 51 DePaul L.Rev. 183, 197 (2001); see also Steven R. Gabel, High/Low Settlement Agreements: Method for Dispute Resolution, 73 MI Bar Jnl. 74, 74-5 (1994) (noting that high-low agreements protect defendants from exposure exceeding policy limits and allow plaintiffs with sizable economic and non-economic damages to enjoy the certainty of a minimum payment amount; "[t]he [high-low] agreements promote finality, certainty, ease of administration and a degree of comfort for the parties to the agreement"). High-low agreements also facilitate trials:
It is no secret that our system of civil justice has generated a pent-up demand for low-cost litigation. As a result, a procedure that lowers the cost of litigation  for example, a small-claims *595 court  will increase the volume of litigation and the number of trials (albeit cheaper, quicker trials). The development of the high-low agreement demonstrates the existence of a parallel demand for low-risk adjudication. Any technique, public or private, that reduces the range of possible outcomes at trial could help answer that demand by making trial less scary, which might encourage more parties to take their chances and try it.
Samuel L. Gross & Kent D. Syverud, Don't Try: Civil Jury Verdicts in a System Geared to Settlement, 44 UCLA L.Rev. 1, 61-62 (1996) (citations omitted). To require publication of high-low agreements to juries might go some way in defeating these objectives.
Moreover, "If the true alignment of the codefendants is apparent to the parties, the court and the jury, introduction of the agreement to the jury is unnecessary because there is no prejudice to be avoided." Monti v. Wenkert, 2006 WL 3908564, *14, 2006 Conn.Super. LEXIS 3849, 45-6 (Conn.Super.Ct.2006). This logic was mirrored in Smellie, where the third district held that, since high-low agreements were a "common form of settlement" and did not shift liability, their compulsory admission into evidence was sufficiently prejudicial to warrant a new trial on liability. Smellie, 510 So.2d at 998. Similarly, in this case, Travelers was in a position adverse to Gulf regardless of the agreement because it was potentially liable for damages resulting only from the first two accidents, whereas Gulf was responsible for damages caused by the third accident. As such, Travelers would naturally attempt to shift fault to the third accident. In addition, Gulf had greater potential for liability than Travelers because it had $11,000,000 of coverage under its applicable insurance policies ($1,000,000 automobile liability policy in addition to $10,000,000 umbrella policy), as opposed to a combined $2,000,000 in coverage, $1,000,000 for each of the first two accidents, under Nair's Travelers policy. Therefore, despite the high-low agreement, the Nairs would also be inclined to argue that the third accident was the primary cause of Nair's injuries and medical expenses. Accordingly, while the agreement relieved Travelers from exposure to a "bad faith" suit,[3] it did not cause either Travelers or the Nairs to shift alignment and litigate this case for each other's benefit  the danger of a "sham of adversity" between plaintiff and settling defendant, see Dosdourian, 624 So.2d at 246 (citation omitted), was not present in this case. Therefore, we conclude that introduction of the agreement into evidence would have been unnecessarily prejudicial.
Also of concern is the possibility that disclosure of high-low agreements may lead to improper publication of insurance coverage to juries. Florida courts have recognized the public policy of this state of not presenting evidence of insurance coverage to juries. In re Amendments to the Rules Regulating the Fla. Bar  Advertising, *596 ___ So.2d ___, ___, 2006 WL 3093126, at *25-26, 2006 Fla. LEXIS 2594, 70 (Fla.2006); see also Beta Eta House Corp. v. Gregory, 237 So.2d 163, 165 (Fla. 1970) (stating that existence or amount of insurance coverage has no bearing on issues of liability and damages, and such evidence should not be considered by the jury), superseded by statute on other grounds, Hazen v. Allstate Ins. Co., 952 So.2d 531 (Fla. 2nd DCA 2007) (citing § 627.7262, Fla. Stat. (1991)). To disclose the high-low agreement in this case would in effect reveal to the jury the amount of Nair's uninsured motorist coverage under his insurance policy with Travelers. Therefore, while Dosdourian encourages full disclosure to the jury, see Dosdourian, 624 So.2d at 247, and an uninsured motorist carrier that is lawfully sued by a plaintiff and properly joined as a party to the lawsuit must be disclosed to the jury as a party defendant (as opposed to being identified as a co-counsel for the tortfeasor), Medina v. Peralta, 724 So.2d 1188, 1189 (Fla.1999); see also Krawzak v. Gov't Employees Ins. Co., 660 So.2d 306, 310 (Fla. 4th DCA 1995), we find that disclosure in the instant case would have been unwarranted.

Neurosurgical Independent Medical Examination
The second issue on appeal concerns Gulf's request for an independent medical exam ("IME"). On July 23, 2004, after calendar call and about five weeks before the trial was originally scheduled to commence, Gulf served a Notice of Request for Physical Examination pursuant to Florida Rule of Civil Procedure 1.360,[4] to be given by Dr. Jordan Grabel ("Grabel"), a neurosurgeon. As Gulf's counsel explained at the hearing on its request, it had previously deemed a neurosurgical IME unnecessary because another expert witness, a prominent treating neurosurgeon, had already issued a report stating that the motor vehicle accident of July 17, 1999 (the first accident) was the major contributing cause of Nair's symptoms, injury, disability and need for medical and surgical care, a judgment favorable to Gulf's defense. However, as a result of that doctor's subsequent deposition testimony, in which he attributed the majority of Nair's complaints to the third accident, Gulf's counsel argued that it needed another expert neurosurgeon to rebut his revised opinion. Nevertheless, the trial court sustained the Nairs' objection to the motion.
On September 21, 2004, the trial court conducted hearings on pretrial issues and Gulf again requested the Grabel IME, which the trial court denied as well as rejecting Gulf's subsequent motion for rehearing. Even so, Gulf never again requested *597 the Grabel IME, nor took a single step towards asking the court to revisit its ruling, despite the fact that the trial did not begin until March 2005 as a result of delays caused by Hurricane Jeanne. As such, we find that Gulf waived its right to appeal the denial of its request for the Grabel IME. Cf. Antun Inv. Corp. v. Ergas, 549 So.2d 706, 708 (Fla. 3d DCA 1989) (where party provided with copies of reports two days before trial commenced and the court recessed for an additional week, and neither deposed the expert nor requested a continuance, the court found that any prejudice befalling that party from admission of the reports was attributable to its own failure to act); see also Leinhart v. Jurkovich, 882 So.2d 456, 460 (Fla. 4th DCA 2004) (stating that whether to permit a defendant's requested examination under Florida Rule of Civil Procedure 1.360 is a matter of discretion) (citing State Farm Mut. Auto. Ins. Co. v. Shepard, 644 So.2d 111, 111 (Fla. 2d DCA 1994)).
Based on the foregoing, we affirm as to both issues.
Affirmed.
WARNER and GROSS, JJ., concur.
NOTES
[1] According to the complaint, Joseph A. Craft, an employee of Gulf, negligently operated a motor vehicle owned by Gulf while in the course and scope of his employment, causing the vehicle to collide with a motor vehicle operated by Nair.
[2] Declaring Mary Carter agreements void as against public policy, the Florida Supreme Court in Dosdourian defined the typical Mary Carter agreement as "a contract by which one codefendant secretly agrees with the plaintiff that, if such defendant will proceed to defend himself in court, his own maximum liability will be diminished proportionately by increasing the liability of the other co-defendants." Dosdourian, 624 So.2d at 243.
[3] "`Bad faith' in the defense of the insured in a claim for personal injury is the failure of the insurer to advise the insured of settlement opportunities, to advise as to the probable outcome of the litigation, to warn of the possibility of an excess judgment, and to advise the insured of any steps he might take to avoid same . . . The insurer must investigate the facts, give fair consideration to a settlement offer that is not unreasonable under the facts, and settle, if possible, where a reasonably prudent person, faced with the prospect of paying the total recovery, would do so. The question of bad faith arises when a verdict is rendered in excess of the insured's policy limits. If the insurer of the tortfeasor had an opportunity to settle within the policy limits under circumstances in which it, exercising reasonable care and good faith to its insured, should have settled, the insured tortfeasor has a cause of action for bad faith." Campbell v. Gov't Employees Ins. Co., 306 So.2d 525, 528-31 (Fla.1975).
[4] Florida Rule of Civil Procedure 1.360(a) states, in pertinent part:

(1) Any party may request any other party to submit to, or to produce a person in that other party's custody or legal control for, examination by a qualified expert when the condition which is the subject of the requested examination is in controversy.
(A) When the physical condition of a party or other person under subdivision (a)(1) is in controversy, the request may be served on the plaintiff without leave of court after commencement of the action, and on any other person with or after service of the process and initial pleading on that party. The request shall specify a reasonable time, place, manner, conditions, and scope of the examination and the person or persons by whom the examination is to be made. The party to whom the request is directed shall serve a response within 30 days after service of the request, except that a defendant need not serve a response until 45 days after service of the process and initial pleading on that defendant. The court may allow a shorter or longer time. The response shall state that the examination will be permitted as requested unless the request is objected to, in which event the reasons for the objection shall be stated.