DISTRICT COURT OF APPEAL OF THE STATE OF FLORIDA
FOURTH DISTRICT

**UNIVERSAL PROPERTY & CASUALTY INSURANCE COMPANY,**
Appellant,

v.

**WEST NAZE,**
Appellee.

No. 4D2024-0098

[June 4, 2025]

Appeal from the Circuit Court for the Seventeenth Judicial Circuit, Broward County; Martin J. Bidwill, Judge; L.T. Case No. CACE21-10008.

Kara Rockenbach Link and David A. Noel of Link & Rockenbach, PA, West Palm Beach, for appellant.

Elliot B. Kula, W. Aaron Daniel, and William D. Mueller of Kula & Associates, PA, Miami, for appellee.

MAY, J.

An insurer appeals a judgment stemming from a water damage claim. The insurer argues the trial court erred in admitting irrelevant and prejudicial claims handling evidence, which denied it a fair trial. We agree and reverse.

This case sprung from a water damage claim the insured made against his insurer. The plaintiff insured reported the water damage on December 10, 2020. The insurer sent a field adjuster to inspect the premises a few days later. On December 18th, the insurer requested fourteen items. The insured answered the letter on December 29th, attaching some, but not all, documents requested. The insured submitted additional documents a few days later.

The insurer did not respond until February 19th when it sent another letter asking for documentation, most of which the insured had already sent. The insured's adjuster emailed the insurer asking about the required documents and eventually contacted the insurer's examiner.

The insured filed a complaint alleging his insurer breached the insurance contract; he did not allege any bad faith or wrongdoing. The insurer denied

liability and asserted that the insured failed to satisfy a condition precedent, the production of documents detailing the claim.

In its second motion in limine, the insurer asked the court to preclude any bad faith or claims handling evidence at trial. The court apparently did not rule on the motion. The parties eventually filed a joint pretrial stipulation.

- *The Trial*

In his opening statement, the insured's attorney told the jury:

> The insurance company, when they made their decision, **we'll find out they weren't waiting for documents, they were just flailing around.** So the public adjuster will testify . . . [w]hen he called in, they said they didn't have an adjuster assigned to the case.

The insurer objected, and argued the opening statement was getting into claims handling and bad faith. The insured responded that he was merely discussing the chronology of events and was not intending to show the insurer's bad faith.

The following exchange occurred at side bar:

> [Insured's counsel]: **There's a dispute about whether the insurance company was reasonably requesting documents at the time that the coverage determination was made. That's one of their defenses. I'm saying they weren't asking for documents, they hadn't even assigned an adjuster . . . .**
>
> [Insurer's counsel]: **But whether an adjuster is assigned, when an adjuster is assigned, in regards to any of that stuff, it's all claims handling as well as whether we were requesting the proper documentation or not**. It all goes into that.
>
> [Insured's counsel]: **Regarding the documents, there was no one there to look at it. That's why it's important that an adjuster wasn't assigned. If they credibly were believing that there was a document defense, they would have assigned somebody who reviewed those documents.**
>
> [Insurer's counsel]: That literally goes into claims handling.
>
> [Insured's counsel]: That's not how – it's –
>
> [Insured's co-counsel]: The chronology of a claim is always admissible.

2

[Insured's counsel]: How can I not talk about claims handling –

[Court]: The chronology of the claim?

[Insured's co-counsel]: Yeah.

[Insured's counsel]: Yeah, I'm just talking about the communications. These are letters that they –

[Insurer's counsel]: He's saying that based on how the insurance company was handling the claim prior to.

[Insured's co-counsel]: No one said bad faith.

[Insurer's counsel]: You don't have to say bad faith.

[Court]: Objection overruled. Objection overruled.

The insured resumed his opening remarks; the insurer again objected.

During the insurer's opening, counsel told the jury:

[The insurer] receives some documents, but not all of what [it] is asking for. And then [the jury is] going to hear that [the insurer] also sends out a second letter February 19 of 2021, again requesting further documentation.

Now, Counsel mentioned that there was tons of documents received, tons. There's a plethora of documentation that was received or sent to [the insurer]. What you'll also hear about in this case is that the leak from the kitchen happened from the dishwasher, okay? [The insurer] never receives any receipts or invoices from the plumber. [The insurer] never receives any invoices or receipts of whether that dishwasher was recovered or whether it was replaced, that particular appliance.

The insured's adjuster testified about the condition of the property and his communications with the insurer. In January, the insurer had asked the adjuster for a water usage record and the adjuster replied that it was impossible to obtain this information. The insured introduced the signed proof of loss into evidence. The insured also admitted an estimate the contractor provided for repairs and other documents.

The insured's counsel asked the adjuster:

3

Q. At this point, after submitting your estimate, the inspection report, the mold test, your letter of representation, your estimate, your photos, and sending this information after receiving the second request for information letter, did [the insurer] ever reach out back to you saying there was additional information pending?

A. No, they did not.

Q. When was the last time that you got in contact with [the insurer]?

A. It was after the 90 days, and it was by field -- excuse me, a claim examiner. I don't remember his name, it's in an e-mail. But he was just saying, hey, I'm assigned. I reached out to him kind of like, hey, introducing myself, let's move this forward. And his response was kind of like, we're working on it. It's in the e-mail. **And of course, that turned into no response; after that, we never heard from them.**

. . . .

A. This is a letter that I uploaded to [the insurer's online system]. At this point, we were, the [insurer] e-mail was no longer active, so if you want to get something to [the insurer], you have to make a letter, whether it's a complaint or some kind of something you want to tell them or submit.

So this is a letter dating when I had contacted them, on March 10th, 2021. They said that the claim still had not been assigned. **Then I mentioned that, or under that, I mentioned that I called before, and I requested an emergency action to assign an examiner, and nobody had been assigned**. So from the 26th to the 10th, March 10th, there was no movement –

The insurer again objected as the questioning went to claims handling. The trial court overruled the objection and explained:

> **I don't see how it has anything to do with bad faith or claim handling. [The adjuster is] giving his testimony from his perspective as to the status and movement of the claim, <u>handling of the claim</u> between [insured] and [insurer]. There's no indicia here there was any bad faith, no one's claiming bad faith.**

The insured submitted another letter into evidence, the defendant objected on the same grounds, and the court overruled the objection.

4

Next, the adjuster testified about his communications with the examiner, who was assigned in April:

> I just, I tried to be friendly. I said, hey, I understand that you just got this file. Please respond with your contact information though. I need to find out what the field examiner's estimate is, which basically is your position, your estimate. I let him know, hey, this has been open for four months. It's just now being assigned. I even said, **it's not your fault, but intake really dropped the ball on this one**, and the homeowner is upset. Please call me and let me know when a good time to discuss this claim is.

The insurer's bad faith objection was overruled. According to the adjuster, the examiner replied that he would get back to him in two days, but many more days passed without a reply. He testified that he never got a coverage determination from the insurer.

The insurer moved for a mistrial. The court denied this motion.

> I find it ironic that you say that what [the insured] was commenting upon on claims handling and timing, of course, it's okay for you to argue on behalf of your client that, in fact, well, the homeowner didn't timely file their claims against the insurance carrier, and therefore, as a result of not filing timely claims, they're out of luck. Okay?
>
> But on the other hand, for them to comment -- and it does, it has nothing to do with the claims handling. **It has to do more specifically with the fact that there was delay with respect to responding.** And I don't find anything wrong whatsoever. **That's not commenting on the claim handling process. It's just commenting on the fact how the claim was handled by the insurance carrier.**

The insured's counsel responded that the purpose of the exhibits and emails was to determine the "crux" or "reason for the denial of the case." He said it was "very important to see whether [the insurer] is actually wanting the documents that [the insured] sent, or whether those are specious arguments being made at this time, after documents were submitted[.]"

The insurer replied that it was looking for corroborating evidence for the proof of loss. The insured responded: "They've [the insurer] never asked for that. So if they were asking for corroborating evidence, there'd be in one of their communications."

The insured testified about the apartment, the water damage, and how he found out about it. The insurer's counsel asked about the letters it sent him. It did not ask about their communications. Following his testimony, the insurer moved for directed verdict on seepage grounds, which the court denied.

The insurer's corporate representative testified the field adjuster inspected the insured's property and sent the findings to the insurer so it could investigate. A few days later, the insurer emailed the insured requesting certain information. The representative testified the insurer did not receive certain receipts or plumbing documents from the insured, nor photos or videos. This failure "prejudiced [the insurer's] ability to properly carry out its investigation on the claim."

The insurer moved for directed verdict on certain issues and renewed its motion for mistrial, listing "references to claims handling and bad faith" which prejudiced the insurer. The court instructed the jury on the law the next day.

> The claims and defenses in this case are as follows. [The insured] and [the insurer] entered into a contract to insure [the insured] for direct physical loss to his residential property subject to all the terms, conditions, and exclusions of the insurance contract. [The insured] claims that [the insurer] breached this contract by failing to compensate him for damages allegedly caused by a plumbing loss.
>
> [The insurer] disagrees with [the insured] and denies that it breached the insurance contract. [The insurer] further contends there was no coverage because [the insured] failed to substantially comply with his duties after loss to provide [the insurer] with the records and documents it requested, resulting in prejudice to [the insurer] and/or the damages claimed by [the insured] were caused by excluded, constant, or repeated seepage or leakage of water over a period of weeks, months, or years.

The parties then made their closing arguments.

The insured's counsel explained:

> You [the jury] get to determine believability. **Now, we learned, during this case, that they didn't even have an adjuster assigned at the time they were making these document requests. They didn't assign an adjuster until April. So who was it that was looking at these documents and making a determination? When we begged for a determination in April, correspondence with them, did they say, no problem, we'll get you a determination, we're missing these documents? No, they said nothing.** They said, we're going to talk to a supervisor.

6

Then we said, okay, talk to a supervisor.  Can we please get a coverage determination?  Our client is, they use the word pissed, not my favorite phrase, but -- and what was the response?  Nothing.  Absolutely nothing.  **So where's the prejudice?  There was no investigation**.  What investigation are they talking about?  There was no investigation [. . . .]

Counsel reiterated how the insured immediately reported the claim.  The insurer sent the insured an auto-generated claim acknowledgement letter.

The insurer's counsel then argued:

And [the corporate representative] testified we were trying to figure out what happened in this day on this date of loss, trying to adjust this claim, trying to do right by its insured.  He sends it up to a supervisor, **but as you see, every single document we have received in this case gave us further questions, and he didn't answer them.  Unfortunately, instead of providing us the checks, the documentation before filing a lawsuit, he stayed quiet.  He filed a lawsuit**, and instead, that resulted in prejudice to [the insurer].

The jury returned a verdict, finding the insured proved his property suffered a direct physical loss during the policy period and suffered damages of $47,006.80.  It also found the insurer failed to prove the insured did not submit documents requested and failed to prove the property damage was caused by constant repeated seepage and leakage over a long time.  The insurer moved for new trial, arguing the trial court erred in admitting claims handling evidence.

(The Court):  **The distinction I'm drawing in this particular case is the difference between bad faith on the one hand and, on the other hand, omission and negligence, okay?**  I didn't give a bad faith instruction on this particular case.

Their -- their whole defense was -- here was basically . . . "they" being the [insured] . . . -- is -- . . . **timing is important with respect to the insurance carrier with respect to getting the claim filed timely and getting the information and documents and -- and bill and -- billing for the [insured], I mean, the same -- really, I don't see why there's a distinction with respect to a -- a similar obligation with respect to an insurance carrier.**

[T]here was no evidence here that I -- I can recall -- and I didn't give a bad faith instruction here.  **It wasn't bad faith.  It was just omission and negligence and -- and -- with respect to the**

7

**response of the insurance carrier in this particular case as to why the delay happened and why all this continuing back and forth and back and forth occurred.**

So, I understand, you know, what you're saying here with respect to the -- the case law that talks about bad faith. But I don't -- that was not argue -- it wasn't argued, if I recall correctly, in closing argument -- bad faith. And there wasn't -- **there wasn't an instruction of bad faith**. **It was more like oversight and negligence.** So, based on that, I'm going to have to respectfully deny the motion for new trial [. . . .]

From this order and adverse judgment, the insurer appeals.

- ### *The Analysis*

The insurer argues the trial court admitted irrelevant and prejudicial claims handling evidence, which denied it a fair trial. The insured responds the evidence was relevant in refuting the insurer's affirmative defense, the probative value of the evidence outweighed the prejudice to the insurer, and the trial court reasonably exercised its discretion.

We review an order denying a motion for new trial for an abuse of discretion. *Gen. Emps. Ins. v. Isaacs*, 206 So. 3d 62, 63 (Fla. 4th DCA 2016). We also review questions about the admissibility of evidence for an abuse of discretion. *Gulf Indus., Inc. v. Nair*, 953 So. 2d 590, 592 (Fla. 4th DCA 2007) (citing *Vavrus v. City of Palm Beach Gardens*, 927 So. 2d 992, 995 (Fla. 4th DCA 2006)). The same standard of review applies to a trial court's ruling on a motion for mistrial. *Gulf Indus., Inc.*, 953 So. 2d at 592 (citing *Goodwin v. State*, 751 So. 2d 537, 546 (Fla. 1999)).

"Relevant evidence is inadmissible if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of issues, misleading the jury, or needless presentation of cumulative evidence." § 90.403, Fla. Stat. (2024). Comments that insurers handled claims in bad faith during a breach of contract case can be considered improper. *See Homeowners Choice Prop. & Cas. Ins. v. Kuwas*, 251 So. 3d 181, 183-85 (Fla. 4th DCA 2018).

In insurance cases, "a bad-faith action cannot accrue until the underlying lawsuit seeking insurance benefits is resolved in the insured's favor." *Hunt v. State Farm Fla. Ins.*, 112 So. 3d 547, 549 (Fla. 2d DCA 2013) (citing *Blanchard v. State Farm Mut. Auto. Ins.*, 575 So. 2d 1289, 1291 (Fla. 1991)). A party cannot try a bad-faith claim with its breach of contract case.

Here, the insurer primarily relies on one of our opinions, *Citizens Prop. Ins. v. Mendoza*, 250 So. 3d 716 (Fla. 4th DCA 2018), to support a reversal. We agree that our prior opinion is similar factually and results in the same outcome.

In *Mendoza*, like here, an insurer denied a homeowner's claim for water damage because the damage "fell under a policy exclusion." *Id.* at 717. During trial, the insurer offered evidence that repeated seepage caused the water damage, and thus was not covered. *Id.*

The trial court instructed the jury about the insurer's "duty to adjust" the insured's claim and the interpretation of the policy. *Id.* at 717–18. During closing, the insured said it "was a violation of the ethical responsibilities. It is a violation of the ethical—of the adjuster's law. It is a violation of the contract itself where it says, we will adjust all losses." *Id.* at 718. The verdict form asked the jury: "Did [the company] [ ] properly exclude the claim from coverage under the policy?" *Id.* The jury returned a verdict against the insurer.

We reversed, reasoning that "[t]he main problem with the jury instructions and the [i]nsureds' arguments at trial is that **the jury could have decided the case solely because the adjuster did not 'do a good job' regardless of whether the incident fell within the policy exclusion**." *Id.* at 719 (emphasis added).

Here, evidence concerning the insurer's failure to respond or slow investigation played a crucial role in the case. The essential question was whether the insured complied with the required document production. Yet throughout trial, the insured's counsel suggested the insurer was slow or incompetent in processing the claim. As we stated in *Mendoza*, the jury could have decided the insured prevailed "solely because the [insurer] did not 'do a good job' regardless of whether the incident fell within the policy exclusion." *Id.*

We acknowledge that there are some factual differences between *Mendoza* and this case. Nevertheless, this case is riddled with comments and evidence that went beyond disproving the insurer's affirmative defense and ventured into claims handling. For example, the adjuster testified the insurer "dropped the ball." The insured's counsel argued the insurer was just "flailing around," gave the insured "crickets," did not "take [the claim] seriously," and made "no investigation."

The trial court tried to distinguish this case from that of a bad faith case by saying it was about negligence and omission. Indeed, negligence and omission fall within the definition of "bad faith" or claims handling. Section 626.9541(1)(i), Florida Statutes (2024), classifies "[f]ailing to acknowledge and act promptly upon communications with respect to claims" and "[f]ailing to affirm or deny full

or partial coverage of claims . . . or failing to provide a written statement that the claim is being investigated" as unfair claim settlement practices.

When "'the factual allegations underlying [the insured's] claim are based upon [the insurer's] failure to fairly and promptly perform under its obligations in the contract, that contractual claim can only be asserted, if at all, together with the extra-contractual bad faith claim under section 624.155.'" *Portofino S. Condo. Ass'n of W. Palm Beach, Inc. v. QBE Ins.*, 664 F. Supp. 2d 1265, 1268 (S.D. Fla. 2009) (quoting *Isola Condo. Ass'n v. QBE Ins.*, No. 08-21592-CIV, 2008 WL 5169458, at *3 (S.D. Fla. Dec. 8, 2008)). But a bad faith action ripens only after a breach of contract action concludes. *Id.*

Here, the insured alleged a breach of contract claim. The insured claims he could not make his case without claims handling evidence and comments. If true, then his position is unsupported by the law. *See Portofino*, 664 F. Supp. 2d at 1268. The insured could have relied on the insurer's failure to ask for additional documents, thereby refuting the insurer's affirmative defense without focusing on claims handling or implying the insurer unreasonably delayed in its handling of the claim or did a bad job adjusting the claim.

The insured did not include any allegations of poor claims handling in his complaint. The pretrial stipulations did not include allegations of poor claims handling. In short, the admitted evidence was irrelevant to the issues pled. By admitting this irrelevant evidence, the insured was able to paint the insurer in a bad light and suggest its bad faith in handling the claim. *See Am. Residential Equities LLC v. Saint Catherine Holdings Corp.*, 306 So. 3d 1057, 1059 (Fla. 3d DCA 2020).

We therefore reverse and remand the case for a new trial.

*Reversed and remanded.*

LEVINE, J., concurs.
ARTAU, J., dissents with an opinion.

ARTAU, J., dissenting.

I respectfully dissent because (1) *Citizens Property Insurance Corporation v. Mendoza*, 250 So. 3d 716 (Fla. 4th DCA 2018), does not apply here and (2) the majority fails to correctly apply abuse of discretion review to the trial court's conclusion that the evidence's probative value was not substantially outweighed by the danger of unfair prejudice.

In *Mendoza*, "[w]e reverse[d] the final judgment because *the judge improperly instructed the jury about a duty to adjust the claim and how to construe a*

*contract*[.]" 250 So. 3d at 717 (emphasis added). In doing so, we did not address whether the evidence was erroneously admitted. *See generally id.* 716.

As the majority correctly acknowledges, we review a trial court's decision to admit evidence for abuse of discretion. *Jeanbart v. State*, 299 So. 3d 3, 7 (Fla. 4th DCA 2020). Thus, the decision of whether "[r]elevant evidence is inadmissible" due to the evidence's "probative value [being] *substantially outweighed by* the danger of unfair prejudice" is within the trial court's sound discretion, and should be affirmed on appeal, unless unreasonable. *See* § 90.403, Fla. Stat. (2024) (emphasis added); *Frances v. State*, 970 So. 2d 806, 813 (Fla. 2007) ("[D]iscretion is abused only where no reasonable [person] would take the view adopted by the trial court." (second alteration in original) (quoting *Trease v. State*, 768 So. 2d 1050, 1053 n.2 (Fla. 2000))). Because the evidence presented here was relevant to counter the insurer's second affirmative defense, which was that the insured failed to provide the insurer with all of the required documents, it was not unreasonable for the trial court to conclude that the evidence's probative value was not *substantially outweighed* by the danger of unfair prejudice.

Therefore, I respectfully dissent and would affirm the judgment of the trial court.

\*          \*          \*

**Not final until disposition of timely filed motion for rehearing.**

11